**In re Thomas Irving HOLLANGER and Janet Bracewell Hollanger, Hollanger Rice Farms, Inc., Debtors.**

**Bankruptcy Nos. 580–00628–M, 580–00629–M.**

United States Bankruptcy Court,
W. D. Louisiana,
Monroe Division.

Sept. 2, 1981.

---

John C. Anderson, Baton Rouge, La., Farrar, Perry & Jefferson, Monroe, La., for Mr. and Mrs. Hollanger and Hollanger Rice Farms, Inc.

James P. Madison, Bastrop, La., for Conn. Gen. Life Ins. Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF CONFIRMATION OF THE ABOVE DEBTORS' PLANS OF REORGANIZATION, AS AMENDED

LeROY SMALLENBERGER, Bankruptcy Judge.

The Debtors, through their respective counsel, filed amended plans of reorganization herein; and the confirmation hearings were consolidated and heard on both of said plans on May 13, 1980. There were various objections filed by creditors to said plans, and all of these matters were also consolidated for hearing at the confirmation hearing.

The Court heard testimony at the confirmation hearing and argument of all counsel in favor of (or in objection to) both of said plans; and the Court concluded, at said hearing, that said plans were "fair and equitable" and "feasible." Therefore, the Court announced at said hearing that orders confirming both plans would be entered; and such orders were entered and signed on June 1, 1981.

Therefore, the Court renders the following Findings of Fact and Conclusions of Law with regard to confirmation of said plans.

### BASIC UNDERLYING FACTS AND FINANCIAL PREMISES OF SAID PLANS

Thomas Irving Hollanger and Janet Bracewell Hollanger (hereinafter "Individual Debtors") are the sole stock holders of Hollanger Rice Farms, Inc. (hereinafter "Corporate Debtor"). Both the Individual Debtors and the Corporate Debtor (all of whom may sometimes be referred to herein cumulatively as "Debtors") are principally engaged in farming operations, and they have been successfully engaged in such activities for a considerable period of time. The Individual Debtors own two large farms, and the Corporate Debtor owns two large farms. The Individual Debtors have

been engaged (principally through Thomas Irving Hollanger) in farming operations for over two decades, and the Corporate Debtor has been engaged for over two decades, and the Corporate Debtor has been engaged (through the direction of Thomas Irving Hollanger) in farming operations for approximately one decade.

After successfully operating farming activities for several years, and after having achieved significant gains from sales of farm land, the financial problems of all of the above Debtors were precipitated from a dissolution of their farming activities with Noel Bracewell, who is the brother of Janet Bracewell Hollanger and was formerly a major stock holder in Hollanger Rice Farms, Inc.

A description of this dissolution is contained in the Disclosure Statements filed herein by the Debtors, and the Court accepts the allegations and representations made by both the Individual Debtors and the Corporate Debtors as the true and correct "facts" as to the causes for their financial problems, that is—the filing of the reorganizations were caused by the disasterous dissolution of business affairs with Noel Bracewell.

The Court further accepts the Debtors' representations as true and correct "facts" as to the value of their assets and liabilities as illustrated by the Schedules of Assets and Liabilities filed herein and the Disclosure Statements filed by the Individual Debtors and the Corporate Debtor.

*The assets of the Individual Debtors are as follows:*

| | |
|---|---|
| (1) Real property | $2,820,000.00 |
| (2) (Personal) property | $1,394,150.00 |
| (3) Stock and Corporate Debtor | $1,000,000.00 |
| (4) Total assets | $5,214,150.00 |

Against these assets are shown to be owing the following liabilities:

| | |
|---|---|
| (1) Priority debts (taxes) | $21,000.00 |
| (2) Secured claims | $3,695,371.00 |
| (3) Unsecured claims without priority | $127,664.00 |
| (4) Total liabilities | $3,844,035.00 |

*The assets of the Corporate Debtor are as follows:*

| | |
|---|---|
| (1) Real property | $1,953,000.00 |
| (2) Movable (personal) property | $665,000.00 |
| (3) Total | $2,618,000.00 |

The liabilities against these corporate assets are as follows:

| | |
|---|---|
| (1) Priority debts (taxes) | $600.00 |
| (2) Secured claims | $1,709,000.00 |
| (3) Unsecured claims without priority | $70,689.00 |
| (4) Total liabilities | $1,780,289.00 |

The Debtors have indicated that the unsecured claims shown to be owed by the Corporate Debtor are probably duplications, for the most part, of the unsecured claims shown to be owed by the Individual Debtors. In any event, the estates of the Individual Debtors and the Corporate Debtor appear to be clearly solvent by the substantial margins of equity.

At the time of filing, the Individual Debtors and the Corporate Debtor were engaged in compatible farming operations, with farms being operated in Red River Parish, Louisiana, Morehouse Parish, Louisiana, Drew County, Arkansas. The farming operations were performed in a compatible arrangement between the Individual Debtors and the Corporate Debtor; and particularly, all of the farms were being farmed under the supervision of Thomas Irving Hollanger, with the corporation having entered into a lease arrangement with Individual Debtors. The lease arrangement provided that the Individual Debtors would farm the land owned by the corporation, would use the equipment and implements owned by the corporation, and in consideration for such, would pay to the corporation a portion of the proceeds of the crops cultivated and harvested. The Corporate Debtor would use the proceeds from the lease to pay its creditors.

The Court further accepts as true and correct "facts" the following conclusions. The filing herein was ultimately precipitated by the following sequence: (1) the disasterous dissolution of business relations with Noel Bracewell which impaired the debtors' liquidity and credit; (2) this impairment led to the inability of the Debtors to pay their debts as they matured; (3) the inability to pay debts led to a foreclosure instituted by R. B. Mardis; (4) the foreclosure had the effect of jeopardizing the farming operations of the Debtors and causing the credit of the Debtors to be terminated and dam-

aged; and (5) without credit, the Debtors could not continue their farming operations. Thus, it was necessary to request the relief provided by Chapter 11 of the Bankruptcy Code.

Upon filing, the Individual Debtors received a crop loan during the Chapter 11 proceeding from Tallulah Production Credit Association, which crop loan allowed the Debtors to farm during the year of 1980. Unfortunately, North Louisiana experienced a disasterous drought during the summer and fall of 1980, which caused very low yields throughout the farming community. The Debtors were caught in the drought and sustained losses during the crop year of 1980. This is one of the risks of farming operations; and the entire farming community of North Louisiana experienced problems from the same drought.

Because of this, the Debtors applied for federally-funded disaster loans and crop loans from the federal government, through its agency the Farmers Home Administration (hereinafter "FmHA"). Therefore, the basic premise of the Debtors' plan was (and is) to procure the FmHA loans and use the proceeds to (a) pay creditors in this proceeding and (b) provide monies to plant, cultivate, and harvest a crop during the year of 1981.

At the confirmation hearing, the Debtors presented evidence in support of the feasibility of said plans. Especially, the Debtors presented evidence on the following points.

First, the Debtor presented evidence as to the fact(s) that the fair market value of their assets exceeded the liabilities encumbering said assets and that the FmHA was making a loan and relying on said equity in the Debtors' property. Approximately $800,000.00 of the proceeds from the loan will be used to pay off pre-filing liabilities and administrative debts, which will increase the equity in the Debtors' property for all creditors; and approximately four hundred thousand dollars ($400,000.00) will be loaned to the Debtors to plant, cultivate, and harvest the Debtors' crops.

Secondly, the Debtors' presented evidence that the FmHA had (a) made an extensive analysis of the Debtors' ability to produce crops over a seven-year period and (b) prepared a seven-year budget and income projection for the Debtors. The amount of the FmHA loan was premised upon the seven-year projection, which included a projection as to the ability of the Debtors to repay both the FmHA loan and their present debts (to be satisfied through the reorganization plan).

Third, the Debtors presented evidence that the plan of reorganization was specifically designed and prepared to be in accordance with the projections of the FmHA as to the ability of the Debtors to repay both the FmHA loan and the pre-filing debts over a seven-year period.

The Court, while according substantial weight to the FmHA determinations, must conduct its own examination into the feasibility of the plan. As noted above, the loan to be approved by FmHA will consist of two portions, a disaster loan in the amount of approximately $800,000 and a crop loan in the amount of $400,000. The funds generated from the disaster loan are to be divided between the Individual Debtors and the corporation and will be applied to entirely reduce certain indebtedness.

The Individual Debtors will receive $550,000 of the loan. The money will be disbursed in the following manner:

(1) The Administrative expense of Tullulah production Credit Association will receive $242,000. This sum, coupled with $225,000 received from the sale of certain crops produced in the year 1980, will totally satisfy this claim.

(2) An additional $50,000 will be applied to the remaining administrative expenses which consist mainly of attorney fees.

(3) The tax claims against the debtor will be paid $4,000 with the remainder paid in full in five (5) equal installments.

(4) Payments will be made to the creditors in classes 4, 6, 10, 12, 13 and 16 with the remainder of these debts to be paid in seven (7) annual install-

ments with a "balloon" payment for the balance at the end of the seven year period.

(5) The creditor in class 15 will be satisfied in full.

The Corporation will receive approximately $285,000 from the disaster loan which will be disbursed in the following manner:

(1) The tax claim against this debtor will be paid in full by a $600 cash payment.

(2) The creditors in classes 7 and 10 will essentially be paid in full.

(3) The creditors in classes 3, 4 and 11 will be given substantial cash payments with the remainder of their claims to be paid in seven (7) equal annual installments with a "balloon" payment for the balance at the end of the period.

These disbursements will consume the entire disaster loan but the Debtors will receive a $400,000.00 crop loan that will provide operating funds to produce the 1981 crop. Scott Truck and Tractor Company has advanced approximately $250,000 to the Debtors for the planting and cultivation of the 1981 crop. These advances have been secured by a first mortgage over the cash proceeds of the 1981 crop by approval of the Court. Upon receipt of the crop loan, Scott Truck and Tractor will be fully reimbursed thereby extinguishing their mortgage and FmHA will hold the first mortgage on the 1981 crop proceeds.

Obviously the success of the Debtors' plans depends upon the success of the farming operations. These operations are the sole means of generating cash to pay the creditors according to the plan. The Individual Debtors' plan requires yearly installments totalling $232,835 while the Corporation's plan necessitate operations that must generate an additional $100,000 to $150,000 per year to service the debts to FmHA.

The FmHA, in evaluating the Debtors' loan application, estimated the value of the 1981 crop. The Court recognizes the expertise of the agency in projecting crop harvests and accepts the estimate of $750,000 as the projected value of the 1981 crop.

Therefore, the Court concludes that the receipt of the $1,200,000 FmHA loans coupled with projected crop proceeds of over $750,000 will provide sufficient funds for the implementation of the Debtors' proposed plans of reorganization. Furthermore, the crop proceeds that may be anticipated from future crops should generate adequate funds to maintain payments in accordance with the plan. This finding of feasibility is buttressed by the investigation by the FmHA of the Debtors' financial and farming condition. Finally, the substantial equity cushion of the Debtor heightens the feasibility of the plan by providing an additional source of funds for the payment of creditors through a sale of some assets.

Significantly, the only evidence presented in favor of or against confirmation of the plans was, in fact, presented by the Debtors; thus, the only evidence presented has supported the feasibility and fairness of the plans filed by the Debtors. Moreover, that evidence proved that the plans were prepared and presented after much time and study and in accordance with the feasibility analysis made by the FmHA. To reiterate, the funding of over $1,000,000.00 of loans by the FmHA is premised upon the Debtors' ability to consummate said plans. The testimony at said hearing indicated that the loan would, in fact, be made, so that the initial major premise of the plan is probable; and if this initial premise of the plan (funding of the loan by the FmHA) is achieved, the plan will be feasible and consummated over a seven-year period. For all of the above reasons the Court accepts the facts represented by the Debtors as to (a) their financial difficulties, (b) the amount of their assets and liabilities, (c) the fair market value of their assets, (d) the equity in their property for their creditors, (e) the feasibility of the plans presented herein, and (f) all other important matters bearing on the confirmation of the plan. No objecting creditor presented *any* countervailing evidence in support of their objections to the feasibility of the plans.

## ANALYSIS OF CLASSIFICATIONS UNDER THE PLANS

■ The classification process of both plans of reorganizations attempts to give similar treatment to creditors of equal right with claims against the same property; conversely, creditors of different properties, are placed into different classes. The classification does not do substantial violence to any claimant's interest, nor does it uselessly increase the number of classifications; and it places creditors with differing interests in separate classes. Finally, the Court finds that creditors are not arbitrarily classified or discriminated against by the classifications set out in the Debtors' plans.

Essentially, the plans classify administrative and priority debts in separate classes and provide their payment upon confirmation. Then, creditors who hold mortgages or security devices in various items of property belonging to the Debtors are placed in separate classes and treated separately. Finally, unsecured creditors, and especially trade creditors and suppliers of the Debtors, are placed in one final class and treated equally.

Based upon the above, the Court finds that the classification provided in said plans does not, *per se*, violate any of the basic premises of the Bankruptcy Code. In fact, the objections of each creditor do not relate to the classification of their claims, but relate principally to whether the creditors are receiving "fair and equitable" treatment under both plans. Therefore, the Court finds as a matter of fact, and concludes as a matter of law, that the classifications of creditors into the classes under both plans complies with Section 1122 of the Bankruptcy Code.

## ANALYSIS OF SPECIFIC TREAT-MENT/SATISFACTION ACCORDED CLASSES OF CREDITORS

The Individual Debtors' plan provides for twenty-one classes of creditors, of which classes one and two deal with priority debts, classes three through nineteen deal with secured debts, class twenty deals with contingent debts, and class twenty-one deals with unsecured debts.

The basic premise of the Individual Debtors' plan is that they will retain their property, restructure their liabilities, refinance their debts, and continue their operation to pay creditors through the refinancing and at a future earnings.

Approximately eight hundred and thirty five thousand dollars ($835,000.00) will be borrowed by the Debtors cumulatively from the FmHA for payment of claims under the plans, of which approximately two hundred eighty five thousand dollars ($285,000.00) will be used to pay creditors under the Corporate Debtor's plan and of which approximately five hundred and fifty thousand dollars ($550,000.00) will be used to pay creditors under the plan filed by the Individual Debtors.

## PLAN OF INDIVIDUAL DEBTORS

■ Classes one and two are priority debts, and these debts will be paid in cash and in full at, or shortly after, confirmation. These classes are deemed unimpaired under the plan.

■ Classes three through nineteen provide for secured creditors. Of these classes, classes fourteen and seventeen are deemed to be unimpaired. Class fourteen will have its debt paid in full prior to confirmation through a sale of its underlying collateral, and the creditor in class seventeen who will receive full satisfaction by the abandonment of its collateral, (*i. e.*, this creditor will give full credit for the value of its collateral, which exceeds the amount of its debt).

As to the other secured creditors (classes three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, fifteen, and sixteen), they will receive a reasonable portion of the loan proceeds from the FmHA in partial payment of their claim. Thereafter, they will be paid one hundred percent (100%) of their allowed claims.

■ Classes three, four, five, six, seven, eight, nine, and ten hold mortgages on the real property of the Debtor. These creditors will receive annual installments providing full payment of interest, and some re-

duction of principal, over seven years. At the end of seven years, the balance of any principal and deferred arrearages will "balloon" (become fully due and owing), at which time the debtor will have to satisfy these claims in full. Similar to Section 75 of the old Bankruptcy Act and to Chapters X and XII of the Chandler Act, this plan will provide a reasonable "breathing room" (i. e., seven years) within which the Debtors' may retain their property and try to pay these creditors in full through sales or refinancing of their property. During the seven-year period, the classes (creditors) will receive reductions in the principal amount of their claims.

The Court has found that the plan filed is feasible; therefore it is probable that these annual payments will be made. Logically, if the Debtors are able to make the annual installments provided for under the plan (thereby reducing the debts on their property) and if they gain any significant appreciation in the value of their land, there should be a sufficient "equity spread" (the difference between the fair market value of the property and the debts owed on the property) at the end of the seven-year period to provide for sales or refinancing of the property to satisfy these classes of creditors in full.

■ The creditors in classes eleven, twelve, thirteen, fifteen, sixteen, and eighteen, hold mortgages on movable property (e. g., equipment) and will receive full payment over seven years in equal annual installments. Here again, because the individual Debtors' plan is feasible, the Court concludes that it is probable that these creditors will be satisfied in full and will retain their lien on their collateral during the repayment.

■ The creditor in class nineteen holds the chattel mortgage on a bulldozer belonging to the individual Debtors. This will be given back to this creditor in partial satisfaction of this claim; and after imputing the appraised value of the property against the debt, this creditor will have the unsecured (undersecured) portion of its claim satisfied in the same manner as unsecured claims which are placed into class twenty-one.

Class twenty are the creditors whose debts are *primarily* owed by the Corporate Debtor, but whose debts have been personally guaranteed by the Individual Debtors. The plan provides that these creditors (holding contingent claims against the Individual Debtors) will be paid through the Corporate Debtor's plan; and if they are not satisfied through the consummation of the Corporate Debtor's plan, they may apply to this Court to have their claim deemed unsecured against the Individual Debtors and be satisfied in accordance with the Debts placed in class twenty-one (all general unsecured debts).

The claims in class twenty-one are the general unsecured debts of the Individual Debtors. These creditors will be paid in seven equal annual installments.

■ The Court finds that there is at least one class of creditors who has accepted the plan, that all classes of creditors are receiving the liquidation value of the Debtors' property, and that all classes of creditors are receiving "fair and equitable" treatment required under Section 1129(b). Therefore, any impaired classes not accepting the plan are properly provided for, so that this Court may confirm the plan over any objecting creditors or objecting classes of creditors.

Finally, and importantly, the plan provides that, in the alternative there is a substantial default in the performance of this plan, creditors may apply to this court to have the plan declared in default, in which event the assets of the Debtors (remaining in their possession and under their ownership) would revert back into *custodia legis* of this Court. Then, there would be commenced an orderly liquidation of the Debtors' property for the satisfaction of all creditors' claims. Hence, the plan provides that the jurisdiction of the Court will continue to insure completion of this plan; and in the event of default of this plan, the Court will be revested with jurisdiction over the Individual Debtors and their property

to commence an orderly liquidation. Therefore, notwithstanding the fact that the Court deems this plan feasible, the Debtors' have provided alternative protection for their creditors in the form of any orderly liquidation, in the event their plan cannot be complied with and fully completed.

## PLAN OF CORPORATE DEBTOR

■ As to the Corporate Debtor's plan, it has similar provisions to the plan of the Individual Debtors. The basic plan is that the Corporate Debtor will retain its property, restructure its liabilities, refinance a portion of its debt, and satisfy its creditors through proceeds derived from future earnings. It also has a liquidation alternative, in the event that the Corporate Debtor defaults in performing under the plan. Of the monies provided through the FmHA loan, approximately $285,000.00 will be paid to creditors of the Corporate Debtor.

Priority debts are placed in classes one and two, will be deemed unimpaired, and will be paid upon or shortly after confirmation. Creditors in classes nine and ten will be paid in full from the loan proceeds, so that they will not be impaired. Stockholders are placed in class fourteen, and this class will not be impaired. The impaired classes are, then, classes three through eight, and classes eleven through thirteen.

Classes three, four, five, six, seven, and eight hold mortgages on the Debtor's real estate. Classes three and four hold first mortgages on the two farms owned by the Debtor, and they will receive substantial proceeds from the FmHA loan. Thereafter, all of these classes holding real estate liens will receive annual installments over seven years, providing full payment of interest and some principal reduction(s). The balance will "balloon" (become fully due and owing) seven years after confirmation. Similar to the plan filed by the Individual Debtors, the Court feels that these creditors are receiving "fair and equitable" treatment provided under Section 1129(b) of the Bankruptcy Code.

As to the classes eleven and twelve, these creditors hold liens on other collateral, and they will be paid in seven equal annual installments.

Unsecured creditors are placed in class thirteen, and they will be paid in seven equal annual installments.

For all of the reasons given regarding the Individual Debtors' plan, the Court feels that the provisions provided under the Corporate Debtor's plan of reorganization are also "fair and equitable" in their treatment of all creditors and classes of creditors.

Since at least one class under the Corporate plan is deemed unimpaired and/or has accepted the plan, and since all creditors are receiving the liquidation value of their claims, the Court finds that the Corporate Debtor's plan of reorganization may be confirmed over the objections of creditors.

## ANALYSIS OF THE GENERAL TREATMENT/SATISFACTION OF CLAIMS UNDER BOTH PLANS

As we stated above, the basic underlined premise of both plans is that the Debtors will receive a loan of approximately $1,200,000.00 from the FmHA, of which approximately $800,000.00 would be used to pay pre-filing claims and post-filing claims and of which approximately $400,000.00 would be used for a crop loan during the year of 1981 to produce a crop for said year. The proceeds from the crop harvested in 1981 would be used to satisfy creditors under the plan, and proceeds from crops and years thereafter would also be used for satisfaction of creditors claims.

The plans envision the use of those proceeds to be allocated among creditors under the plans. Most creditors will, then, receive payment in full over seven years [or receive annual installments on their debts over seven years, with the provision that said debts will "balloon" (become fully due and payable) seven years after confirmation].

The plan basically presents a system of reorganization for a farmer. Because of this, the Court will attempt to analyze the systems of rehabilitation afforded to farmers historically through the years and to compare the treatment accorded creditors under the Debtors' plans with that provided

under prior bankruptcy law (from a historical standpoint).

In 1933, Congress passed Section 75 of the Bankruptcy Act (as an amendment to the Bankruptcy Act of 1898) to provide for relief for farmers. The Bankruptcy Act was enacted in 1898, and the amendment passed in 1933 was commonly known as the "Frazier-Lemke Act". The constitutionality of the Frazier-Lemke Act was litigated in three important Supreme Court cases: *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935) [hereinafter cited as *"Radford"*]; *Wright v. Mountain Trust Bank*, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937) [hereinafter cited as *"Wright I"*; *Wright v. Union Central Life Insurance Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1941) [hereinafter cited as *"Wright II"*].

The first Supreme Court case, *Radford*, held Section 75 to be *unconstitutional*. Thereafter, the Frazier-Lemke Act was amended; and it was subsequently upheld in the following two cases (*Wright I and Wright II*) in 1937 and 1941. *Wright I* was decided in 1937; and it contains an extensive analysis of Section 75. Essentially, Section 75 allowed the Bankruptcy Court to stay all judicial proceedings against farmer's/debtor's property for three years. At the end of three years, or prior thereto, the farmer/debtor could pay into the court the amount of the appraised value of the property of which he retained possession. Essentially, this allowed the debtor (a) a three-year moratorium and (b) the right to buy all or a portion of his land back for the appraised value. Ordinarily, the Act afforded the debtor a three-year period of rehabilitation, but the stay provided was not absolute; for the Court could terminate the stay and order a sale of the property at an earlier date for various reasons.

The farmer/debtor was specifically allowed the right to retain the possession of his property during the stay, subject to the requirement that the farmer pay a reasonable rental semi-annually for the part of the property of which he retained possession. If the farmer/debtor was unable to refinance within three years, the Court could order the appointment of a trustee and order the property sold or disposed of. The Court could require that the debtor pay (in addition to the rental) other payments or principal owing by the farmer/debtor to secured or unsecured creditors. Again, the Frazier-Lemke Act was extensively analyzed in *Wright I* and upheld from a constitutional standpoint.

In *Wright II*, the Frazier-Lemke Act was further upheld regarding certain provisions and the Court made other observations about the policy of the Act in general. Specifically, at page 278, 61 S.Ct. at page 199 and thereafter the United States Supreme Court pointed out that Section 75 "provided a procedure to affect a broad program of rehabilitation of distressed farmers faced with the disaster of poor sales and an oppressive burden of debt."

The Supreme Court further stated that "[s]afeguards were provided to protect the rights of secured creditors, throughout the proceedings, to the extent of value and the property. [citations omitted]. There is no constitutional claim of the creditor to more than that. And so long as that right is protected the creditor is certainly in no position to insist that doubts or ambiguities in the Act be resolved in its favor and against the debtor. Rather, the Act must be liberally afforded by Congress [citations omitted], lest its benefits be frittered away by narrow formalistic interpretations which disregard the spirit and the letter of the Act." *Wright II* at pps. 278–9, 61 S.Ct. at pps. 199–20.

A reading of *Wright I* and *Wright II* illustrate that Congress understood problems of farmers and moved to rehabilitate their finances under Section 75.

However, Section 75 was an emergency measure which expired by its own terms after the enactment of the Chandler Act, which created Chapters X, XI, XII of the Bankruptcy Act. Thus, the Chandler Act replaced the provisions of Section 75 to give rehabilitation to those owning real property. Significantly, Chapter XI could not alter the rights of secured creditors *through a*

*plan. See,* Anderson, "Secured Creditors and their Rights and Remedies under Chapter XI of the Bankruptcy Act", 36 *La.L. Rev.* 1 (1975). Therefore, farmers were only afforded relief via restructuring mortgage debts on their farms through Chapters X and XII. There were not many cases analyzing the restructuring of real estate debts on farms or other parcels of property until the real estate recession of 1974–1975. Thereafter, a great number of cases were decided analyzing the rehabilitation aspects of Chapter XII, and numerous commentaries were written on restructuring of debts on real estate. *See, generally* Anderson and Ziegler, "Real Property Arrangements under the Old and New Bankruptcy Act", 24 *Loyola L.Rev.* 713 (1979). [hereinafter cited as *"Real Property Arrangements"*].

The principal relief which was obviously available to farmers under both Section 75 of the old Act and under the amendments provided by the Chandler Act (under Chapters X and XII) were extensions (moratoriums) which provided "breathing room" within which to pay creditors. *See: In re Benson,* 9 B.R. 854, 7 Bankr.Ct.Dec. 213 (Bkrtcy.N.D.Ill.1981). For example, under Chapters X and XII of the old Act, cases provided extensions from one and one-half years for payment, *see, e. g., In re Triangle Inn Associates,* 3 Bankr.Ct.Dec. 716 (E.D. Va.1977), to as much as twenty years within which to pay creditors. *See, e. g., Wachovia Bank & Trust Co. v. Harris,* 455 F.2d 841 (4th Cir.), *cert. denied* 409 U.S. 844, 93 S.Ct. 47, 34 L.Ed.2d 84 (1972); *In re Benson, supra.* Essentially, the purpose of any reorganization (or rehabilitation) proceeding is to preserve the assets of a debtor and save them from disasterous or premature sales, such as foreclosures, so that junior interests (such as junior mortgage holders, unsecured creditors, and the debtors) will receive the greatest possibility of preserving their rights to recovery/equity in the debtor's property. *See,* Blum, "The Law and Language of Corporate Reorganization," 17 *U.Chi.L.Rev.* 565 (1950).

From the above, it is easy to perceive that, after enactment of the Chandler Act, farmers were provided rehabilitation through Chapters X and XII of the Bankruptcy Act, and especially Chapter XII. *See: In re Benson, supra.* The new Bankruptcy Code was enacted in 1978 and became effective in 1979. The reorganization provisions of the old Bankruptcy Act under Chapters X, XI, and XII, were consolidated and amalgamated into one single chapter (Chapter 11) of the new Bankruptcy Code. However, plans of reorganization providing for *extensions* of debt as a primary system of restructuring finances of real estate projects are maintained under Chapter 11 of the new Bankruptcy Code. Therefore, farmers who request relief and propose to pay their creditors in full *via* reasonable extensions in the payment of their debts should be provided relief under the new Bankruptcy Code similar to the relief provided under the rehabilitation provisions of the old Bankruptcy Act. *See, especially, In re Benson, supra,* at footnote 1; *Real Property Arrangements, supra.*

The only limitations which may alter or restrict the relief available to farmers under the new Bankruptcy Code would pertain to any limitations on the Court's "cram down" powers. Specifically, Section 1129(b)(2)(A)(i) provides that a plan may be confirmed against the dissent of a class of secured claims if fair and equitable treatment is accorded to that class by allowing the secured claim to retain their lien on the debtor's property and receive deferred cash payments having a value equal to the secured claim. Further, Section 1129(b)(2)(A)(iii) provides that the plan may also allow secured creditors to realize the "indubitable equivalent" of their claims. Thus, unless it is clear that a class of secured claimants are retaining their lien and receiving ample deferred cash payments, they may argue that they are being deprived of substantive rights by the Bankruptcy Code in not receiving a substitute of the most indubitable equivalent to those rights surrendered. The legislative history indicates that the language pertaining to "indubitable equivalent" was extracted from the approach taken in the case of *In Re Murel Holding Corp.,* 75 F.2d 941 (2nd

Cir. 1935). *See*, House Report No. 95–595, 95th Cong. 1st Sess. 413–418 (1977).

In other words, from the legislative history of the Bankruptcy Code and the portions of Section 1129(b) set forth above, one might argue that, based on the case of *In Re Murel Holding Corp., supra,* creditors may not be deprived of receiving payment(s) for an unreasonably long period of time. A review of *In Re Murel Holding Corp.* discloses that the debtor in that case owned an apartment house and proposed (in a plan of reorganization) to pay the first mortgage holder after a ten-year moratorium on any payments which would reduce the principal amount of the debt. The Court refused to apply this "cram down" on the mortgage holder, arguing that payment after ten years was not completely compensatory nor the indubitable equivalent of the right(s) (to present payment) surrendered by the mortgagee; therefore, the Court held that the mortgagee could not be stayed from foreclosing based on the plan. In support of its holding, the Court found that there was very little equity in the apartment project, that the apartment project had not been financially successful for several years, that the amount advanced to reduce the debts at confirmation was a "trifle", that the plan was very speculative, and that (although the first mortgage holder was to receive payments of interest) the first mortgage holder would not receive any reduction of the principal amount of its debt for at least ten years. The Court found this plan to be unacceptable and reversed an order from the lower Court staying foreclosure by the first mortgage holder.

One might reason from the legislative history of the new Code, which cites the case of *In Re Murel Holding Corp., supra,* that any plan providing for deferrals in payments (or moratoriums) must provide a reasonable time within which principal reductions must be made, but this is not the meaning of the legislative history. *Murel Holding Corp.,* contrary to the implications of the legislative history, does not announce a legal principle applicable to a body of cases. Rather this case illustrates an examination of a bleak financial posture and a

conclusion of the Court. This conclusion gives birth to the so-called standard by merely using the phrase "most indubitable equivalence". The Court did not endeavor to explain this phrase further than to state that the facts of the case and the conclusion that the provisions of the plan did not offer the creditor a "most indubitable equivalence". This Court finds that *Murel Holding Corp.* merely represents a bottom line which cannot be passed if the creditor is to receive an indubitable equivalence.

█ The facts of this case do not reach or pass that bottom line for several reasons. The most substantial of these is the Debtor's substantial equity in the property versus the very limited equity of *Murel Holding Corp.* This large equity cushion offers substantial protection of the creditors' security. Furthermore, the Debtor's financial failure was the result of two disastrous years after a decade of financially sound farming. Whereas, the bankrupt in *Murel Holding Corp.* had established a consistent pattern of financial losses. Finally, the debtors will make some limited payment on principal versus no such payment in *Murel Holding Corp.* Despite the smallness of these payments, the substantial equity cushion protects the creditors. Therefore, the present case is distinguishable from *Murel Holding Corp.* for it presents a vastly better financial situation with sufficient protections for creditors. In light of these differences the Court finds that the payments proposed in the Debtor's plans constitute the indubitable equivalence of the claims of the various creditors.

█ Conversely, one may argue that where the first method of reorganization is proposed in a plan pursuant to Section 1129(b)(2)(A)(i)—that is, that a secured claimant retain its lien on its collateral and receive deferred payments in an amount sufficient to have value equal to that value held by the claimant on the effective date of the plan—the Bankruptcy Court may confirm such a plan under its "cram down" powers. Regardless of the consent of the secured claimant, the dissenting secured

claimant will be receiving the "indubitable equivalent" of the rights it enjoyed upon filing of the reorganization through the plans' provisions. Stated another way, where a dissenting claimant is receiving payment in full over a reasonable period of time, with an appropriate interest or discount factor being paid, that creditor is receiving all that the law requires, that is—full payment over a reasonable period of time. Such a dissenting secured claimant is not being deprived of any rights and is receiving completely compensatory treatment. Therefore, payment over a reasonable period of time with an appropriate interest or discount factor is generally the equivalent of payment now; or at least, it is a satisfactory substitute (provided by reorganization law) for any rights surrendered by the secured claimant pursuant to the "cram down" provided in the plan. *See, e. g., In re Benson, supra.* Therefore, the new Bankruptcy Code allows the restructuring of debts through extensions on a reasonable basis under the foregoing guidelines.

■ As one commentary has noted, bankruptcy courts may "cram down" feasible plans of reorganization under the reorganization provisions (*e. g.,* Section 1129) of the new Bankruptcy Code, where such plans seek to achieve restructuring of mortgage debts secured by real estate, as follows:

(1) The term of any mortgage debt may be extended;

(2) Payments required by the mortgage debt of either principal or interest may be postponed; and

(3) Deferred or reduced payments of principal or interest may be added to the mortgage balance.

*See, Real Property Arrangements, supra,* at pps. 720–728. The postponement of arrearages for a reasonable period of time and the extension of payment (*i. e.,* for seven years in the instant case) appears within the permissible limits as conceived by the prior jurisprudence. *See, In re Triangle Inn Associates, supra; Wachovia Bank & Trust Co. v. Harris, supra; In re Benson, supra; see,* also, *In re KRO Associates,* 4 Bankr.Ct.

Dec. 462 (S.D.N.Y.1978); *In re Castle Village Co.,* 4 Bankr.Ct.Dec. 730 (S.D.N.Y. 1978).

■ Once again, it should be noted that the Debtors' plans provide generally that all secured creditors will be paid after confirmation and generally within seven years thereafter. Certain arrearages and mortgage payments will be deferred until the end of the seven year period; but there is provided an appropriate discount rate for the deferred payments. Thus, creditors will be receiving deferred cash payments totalling at least the amount of their debts and having a current value equal to the value of their lien collateral and retaining their lien in the collateral for the full amount of their debts which are secured, all within Section 1129(b)(2)(A)(i). Unsecured creditors are receiving full payment over seven (7) years. Therefore, each creditor (both secured and unsecured) will be receiving full satisfaction of their claim and retaining whatever collateral is held, which appears to meet the requirements of Section 1129(b) of the Bankruptcy Code.

Most significantly, there were many creditors, and especially creditors holding junior liens and unsecured claims, who directly argued at the confirmation hearing(s) that the failure to confirm the plan would preclude payment of their claims. In other words, if the Debtors' plans were *not* confirmed, there would be a dismissal of this reorganization proceeding or an adjudication of the Debtors into straight liquidation proceedings of Chapter 7 of the new Bankruptcy Code. In this event, the major assets of the Debtors (the farm land and equipment) would probably be sold at private sale or auction. There is a distinct possibility that such sales would be "forced" ones and yield the minimal recoveries for junior creditors.

The economy of the United States is in a recessionary climate, with high interest rates and very little "long-term" mortgage money available. This further depresses the probability of receiving the maximum fair market value for the Debtors' assets. Sales of the Debtors' assets at less than fair

market value would yield little or no recovery for junior lienors and unsecured creditors; nor would this insure that the Debtors' equity in their property would be maintained.

To exacerbate the situation, North Louisiana has undergone a severe drought during the last farm year, which has a further "chilling" effect upon the availability of purchasers for the large farms owned by the Debtors. The most likely purchasers are neighboring farmers, but these prospective purchasers are probably undergoing financial difficulties similar to the Debtors due to the drought, thereby eroding the probability that a liquidation of the Debtors' property at the present time under any forced conditions would yield significant recovery/equity for junior creditors and/or the debtor.

Essentially, there was heavy opposition to confirmation of the plan by holders of first mortgages who were adequately protected, but whose debts were being extended (in payment) over a period of time. Unsecured creditors and junior lien holders spoke, for the most part, in favor of confirmation of the reorganization plan. In fact, the attorneys for the various creditors indicated to the Court that failure to confirm the Debtors' plan might completely erode the possibility of their clients' recovering any monies. The heavy opposition by first mortgage holders, when weighed against a heavy support in favor of the plan by junior creditors, underscores the fact that the most probable means of protection for the interests of those creditors who do not hold superior mortgages (providing adequate protection for their claims) was confirmation of the Debtors' plans. The duty of the Court is to protect all interests, and especially those who do not have collateral adequate to protect the recovery of their debts. Furthermore, there is an express Congressional policy in favor of rehabilitating debtors and maintaining the equity in their property; and the Court cannot be unmindful of the spirit (as well as the letter) of the law, all of which favors rehabilitation of the Debtors and protection/recovery for the junior creditors in these cases. The Court must look to the interests of all creditors, and especially those needing protection, as well as the interests of the Debtors.

## CONCLUSION

For all of the above reasons, the Court concludes that the plans proposed herein by the Debtors are "fair and equitable" in their treatment of all classes of creditors, that said plans comply with the requisites of Chapter 11, and that the plans represent a reasonable compromise. The plans balance the rights of all creditors and the Debtors to achieve rehabilitation of the Debtors' finances and, at the same time, allow creditors the most reasonable and feasible way to be paid by the Debtors. Therefore, the plans of reorganization shall be confirmed by this Court.