**In re Blance Gerald IVERSON and, Angella Marie Iverson, King & Iverson Farms, Debtors.**

**Bankruptcy Nos. 582–00041–M, 582–00046–M.**

United States Bankruptcy Court, W.D. Louisiana, Monroe Division.

Sept. 8, 1982.

John C. Anderson and Daryl K. Manning, Anderson, Anderson, Steffes, Hawsey, Rainach & Stakelum, Baton Rouge, La., for debtors.

Charles C. Trascher, III, Snellings, Breard, Sartor, Inabnett & Trascher, Monroe, La., for Central Bank of Monroe.

Leven H. Harris, Asst. U.S. Atty., Shreveport, La., for Farmers Home Administration.

James R. Jeter, Cook, Yancey, King & Galloway, Shreveport, La., for Ouachita National Bank in Monroe.

Orlando N. Hamilton, Jr., Hamilton & Carroll, Oak Grove, La., for John Hancock Mut. Life Ins. Co.

Louis D. Smith, Hayes, Harkey, Smith & Cascio, Monroe, La., for The Travelers Ins. Co.

Harvey Perry, Farrar, Perry & Jefferson, Monroe, La., for John & Steven Creasy.

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF CONFIRMATION

LeROY SMALLENBERGER, Bankruptcy Judge.

The debtors through their counsel have filed amended Plans of Reorganization herein and moved to confirm them. Both plans were heard by this Court on June 14, 1982. Various objections have been filed by creditors and all of these matters were consolidated for hearing at the confirmation hearing.

The plans before the Court envision full satisfaction of all creditors under permissible means allowed under our bankruptcy laws. The plan for the partnership debtor, King & Iverson Farms, restructures its obligations in accordance with the reorganization principles previously approved by this Court in other cases; and the partnership plan envisions the partnership debtor being able to sell or abandon all or part of its farming property in satisfaction of its debts, or alternatively, to retain part of its farm property and continue operations. The plan filed by Mr. and Mrs. Iverson provides for full satisfaction of all of their individual creditors, which is facilitated by a restructuring of various individual debts. Both plans will rehabilitate the debtors and give them a fresh start in their future financial affairs, while adequately protecting all creditors and providing them full satisfaction for their claims under the plans.

The Court believes that these related plans are "fair and equitable" and "feasible". Therefore, both plans are hereby confirmed.

### BASIC UNDERLYING FACTS AND FINANCIAL PREMISES OF SAID PLANS

The plans of Gerald Iverson and Angella Marie Iverson (hereinafter sometimes referred to cumulatively as "Individual Debtors") are married and residents of Monroe, Louisiana. He is an attorney licensed to practice in the State of Louisiana, and she is a housewife.

In addition, Mr. Iverson is an equal partner with Mr. John King in a Louisiana partnership engaged in farming operations and doing business as "King & Iverson Farms" (hereinafter referred to as the "Partnership Debtor"). The Partnership Debtor owns two large farms, one of which is approximately 1,501 acres and located in Morehouse Parish, Louisiana, and the other is approximately 800 acres and located in Ouachita Parish, Louisiana. [The first farm will generally be referred to as the "Morehouse Farm" and the second farm will generally be referred to as the "Ouachita Farm".]

Mr. Iverson has been successfully engaged in the practice of law in Monroe for

over a decade, and his business of practicing law has not caused any financial problems. Similarly, Mrs. Iverson has been a housewife during the same time, and her activities have not given rise to any financial problems. The Individual Debtors' problems were created from the farming operations and financial difficulties generated by the Partnership Debtor.

In 1978, Mr. Iverson and John King purchased the Morehouse Farm and the Ouachita Farm. Mr. King's contributions were devoted to overseeing and managing the actual farm operations of the Partnership Debtor since Mr. King had prior experience in farming and substantial holdings in other farmland. Mr. Iverson contributed financial, legal, and business advice to the partnership. The farming operations from the years of 1978 and 1979 were moderately successful, but insufficient monies were generated to satisfy all of the indebtedness incurred to purchase the two farms. The farm operations in 1980 were disastrous because of drought and extreme temperatures, producing substantial losses. Similarly, the 1981 farming operations were not profitable due to depressed prices, increased costs, and problems with grain elevators in which crops were stored. The losses were covered and paid for by additional borrowings from the Farmers Home Administration (hereinafter referred to as the "FmHA"), who took second and fourth mortgage positions on the Morehouse farm and a third mortgage position on the Ouachita Farm.

The substantial losses in farming operations culminating at the end of the crop year in 1981 caused the Partnership Debtor to seek relief under Chapter 11 of the reorganization statutes of the Bankruptcy Code. Because the Individual Debtors had guaranteed and endorsed several substantial partnership debts, they were also forced to seek relief under Chapter 11 of the Bankruptcy Code.

In addition to the farming investment, the Individual Debtors also invested in the development in an 80 acre tract of land near Pine Bluff, Arkansas. Their partners in this investment are Malloy Slocum and Donald Williamson. The downturn in our nation's economy, and especially relating to real estate, has caused this development project to contribute slightly to the financial problems of the Individual Debtors.

## ASSETS AND LIABILITIES OF INDIVIDUAL DEBTORS

Other than the investment in King & Iverson Farms, the debtors have the following primary assets:

| ASSETS | VALUE |
|---|---|
| (1) Residence in Monroe, La. | $100,000 |
| (2) ⅓ interest in 80 acres in Pine Bluff, Ark. | 100,000 |
| (3) Rent house in Monroe, La. | 65,000 |
| (4) Liquid assets | 77,000 |
| (5) Miscellaneous movable property (vehicles, & personal property) | 61,600 |
| Total: | $403,600 |

| LIABILITIES | AMOUNT |
|---|---|
| (1) Note to Ouachita Bank secured by 2nd mortgage on Ouachita Farm, 3rd mortgage on Morehouse Farm, 1st mortgage on Debtors' residence, 1st mortgage on a diesel power unit, 1st mortgage on 80 acres in Pine Bluff, Ark. | $310,200 [1] |
| (2) Note to Central Bank secured by mortgage on airplane | 15,000 |
| (3) Note to Monroe Building & Loan secured by 1st mortgage on rent house | 18,000 |
| (4) Various other unsecured debts | 7,646 |
| Total: | $350,846 |

As shown above, other than the Individual Debtors' interest in the partnership property belonging to the Partnership Debtor, the individual assets and liabilities of the Individual Debtors are not massive and unmanageable. Mr. Iverson projects to produce approximately $80,000 or more annually from his practice of law, which should be more than sufficient to pay his individual liabilities under his plan, after liquidating certain partnership and individual assets.

---

1. This debt is a joint obligation between the Partnership Debtor and Individual Debtors, secured against assets of all debtors via cross-collateralization agreements.

## ASSETS AND LIABILITIES OF PARTNERSHIP DEBTOR

The following are the basic Partnership Debtor's assets and liabilities:

| ASSETS | VALUE |
|---|---|
| (1) Morehouse Parish Farm | $2,476,650 |
| (2) Ouachita Parish Farm | 967,000 |
| (3) Cash on hand and in checking accounts | 58,400 |
| (4) Machinery and equipment | 10,000 |
| (5) Inventory of crop | 45,000 |
| (6) Receivables from crop sales | 4,500 |
| | $3,561,550 |

The following are the Partnership Debtor's liabilities:

| LIABILITIES | AMOUNT |
|---|---|
| (1) Note to Traveler's Insurance Co. secured by a 1st mortgage on Morehouse Farm | $919,000 |
| (2) Note to John Hancock Mutual Life Insurance Co. secured by a 1st mortgage on Ouachita Farm | 521,000 |
| (3) Note to Ouachita National Bank secured by a 2nd mortgage on the Ouachita Farm and a 3rd mortgage on the Morehouse Farm | 310,200 [1A] |
| (4) Notes payable to FmHA secured by crop lien on 1981 crops, a 3rd mortgage on Ouachita Farm and a 2nd and 4th mortgage on Morehouse Farm | 1,140,000 |
| (5) Various unsecured debts | 12,144 |
| Total: | $2,902,344 |

Based upon the debtors' analysis, the partnership appears to be solvent, but it appears that the Partnership Debtor has had problems in meeting its obligations as they have come due in the past.

## FINANCIAL PREMISES OF PLANS

### A. Partnership Plan

The plan basically envisions a marshalling and exchange of liens on the two farms, the probable sale of the Morehouse Farm, and the restructuring of debt on the Ouachita Farm, with the options of (a) continuing farming operations on the Ouachita Farm, (b) abandoning it, (c) or selling it.

Against the Morehouse Parish Farm are the following liens:

| (1) | Traveler's Insurance | - | $919,000 |
|---|---|---|---|
| (2) | FmHA | - | 850,000 |
| (3) | Ouachita National Bank | - | 310,200 |
| (4) | FmHA | - | 290,000 |
| | Total Liens: | | $2,369,200 |

The debtors have estimated that the value of the Morehouse Parish Farm is $2,476,650. Since the mortgage debts to both the FmHA and Ouachita National Bank are secured by both the Morehouse Parish Farm and the Ouachita Parish Farm (which is commonly referred to in Louisiana as "cross-collateralization"), it is impossible to determine the recovery positions of these second and third mortgage holders without considering both farms.

The Ouachita Parish Farm has been estimated to have a value of $967,000, against which are the following liabilities:

| (1) | John Hancock | - | $521,000 |
|---|---|---|---|
| (2) | Ouachita National Bank | - | 310,200 |
| (3) | FmHA | - | 1,140,000 |
| | Total | | $1,971,200 |

In regard to the restructuring of debts of the Morehouse Farm, the plan envisions that the first mortgage debt to Traveler's Insurance Co. ("Traveler's") will be reduced to a non-recourse basis. This reduces the lien securing the Traveler's debt to an "in rem" basis.[2] Any arrearages due for the annual installments payable in 1983 will be deferred to come due and owing at the annual payment date in 1987. The first payment on this mortgage debt will be the annual installment coming due in 1983. The deferral of the arrearages for approxi-

---

**1A.** This debt is a joint obligation between the Partnership Debtor and Individual Debtors, secured against assets of all debtors via cross-collaterization agreements.

**2.** This is consistent with valuation principles under 11 U.S.C. § 506(a) and the discharge provisions of 11 U.S.C. § 1141. This Court has previously permitted the "in rem" restructuring of mortgages in this fashion. *See: In re Hol-*

*langer,* 15 B.R. 35 (Bkrtcy.W.D.La.1981); *In re Upshaw,* Case no. 580–01026–M, U.S.Bk.Ct., W.D. of La.; *see, generally,* Anderson & Rainach, Farmer Reorganizations Under the New Bankruptcy Code, 27 *Loyola L.Rev.* —— (Issue no. 4, 1982); Anderson & Ziegler, "Real Property Arrangements Under the Old and New Bankruptcy Acts," 25 *Loyola L.Rev.* 713 (1979).

mately five years gives the debtor and/or any purchaser "breathing room" for the payment of his debt.[3] When the "breathing room" is coupled with the reduction of the mortgage debt to a non-recourse status, the probability of the Partnership Debtors selling this farm to a prospective purchaser for the highest and best price is elevated to the highest and fullest potential.[4]

Also, the restructuring of this partnership debt relieves the Individual Debtors of their personal liabilities, which rehabilitates the Individual Debtors financially. There is no substantial prejudice to this mortgage holder, since it is adequately protected by its collateral (*i.e.*, the value of this land is $2,476,500, or $1,650 per acre, whereas the amount of the Traveler's debt encumbering the land is only approximately $610 per acre.)[5]

The second major restructuring of the debt on this farm concerns the mortgage to Ouachita National Bank (hereinafter "ONB"). ONB is secured by a third mortgage on this property. In front of the ONB third mortgage is a second mortgage to the FmHA of approximately $850,000; and behind the ONB third mortgage position is a fourth mortgage to the FmHA of approximately $290,000. Therefore, the FmHA

mortgage position is bifurcated by the ONB, which is interspliced in a third mortgage position between the FmHA debt. The amount of debt to the ONB is approximately $310,000, but the ONB has other collateral, including a second mortgage on the Ouachita Parish Farm.

The plan seeks to eradicate the ONB third mortgage position and relegate it solely to its other collateral. This has the effect of "stepping up" the FmHA mortgage position into a clear second mortgage for the entirety of its debt. ONB has agreed to this and voted for both plans.

The total approximate amounts of the restructured first and second mortgage debts to Traveler's and FmHA at filing was $2,059,000, which is approximately $1,372 per acre of mortgage debt against an estimated fair market value of approximately $1,650 per acre. There is equity over and above the Traveler's and FmHA's debts. The marshalling/exchange of liens basically protects the FmHA's recovery by giving it an undisputed second mortgage position on a substantial tract of farmland having a value sufficient to satisfy the entirety of the FmHA debt.[6] Thus, the FmHA is fur-

---

**3.** This Court has permitted the restructuring of debts in this manner in other cases. *See* all of the authorities cited at footnote 2, *supra; see, also, In re Benson,* 9 B.R. 854, (Bkrtcy.N.D.Ill. 1981) (Chapter XII of the old Act); *Wachovia Bank & Trust Co. v. Harris,* 455 F.2d 841 (4th Cir.1972) (Chapter X of the old Act); *In re KRO Assoc.,* 4 Bankr.Ct.Dec. 462 (S.D.N.Y. 1978).

**4.** *See* the authorities cited at footnotes 2 and 3, *supra.*

**5.** These provisions of the plans effect a form of "discussion" under Louisiana law, which is arguably analogous to "marshalling of assets" under common law principles. "Discussion" is a concept embodied in Civil Code Articles 3045 *et seq.,* which allows a surety (such as Mr. and Mrs. Iverson are vis-a-vis the Partnership Debtor by virtue of Mr. and Mrs. Iverson's guaranteeing certain partnership debts) to require creditors of the primary debtors to satisfy their obligations from the assets of the primary debtor (which is King & Iverson Farms in the instant case) before proceeding to collect from the surety's (guarantors') assets. In the instant case, such a provision in the plans of all debt-

ors insures that a creditor who is fully secured (and protected), such as Travelers, the FmHA, and John Hancock, and will be fully satisfied by the collateral of the primary debtor and cannot receive double recovery by alleging or asserting an unsecured claim against the estate(s) of the guarantor(s). This Court has previously approved Chapter 11 plans which provided this equitable concept to guard against double or inequitable recoveries. *See: In re Hunt,* Case no. 580–00044, U.S.Bk.Ct., W.D. of La.; *In re McCoy,* Case no. 580–00045, U.S.Bk.Ct., W.D. of La. Moreover, other bankruptcy courts have sanctioned similar results under the doctrine of marshalling of assets and similar equitable theories. *See: In re Jack Green Fashions for Men,* 597 F.2d 130 (8th Cir.1979); *In re Multiple Services Industries, Inc.,* 18 B.R. 635 (Bkrtcy.E.D.Wis.1982).

**6.** Such an exchange/marshalling of liens has previously been approved by this Court in other reorganization cases. *In re Adcock,* Case no. 581–00677–M, U.S.Bk.Ct., W.D. of La.; *see also,* Anderson & Rainach, *supra,* footnote 2.

nished "adequate protection" for its lien claim.[7]

The debtor envisions a sale of this property shortly after confirmation, which could conceivably envision transfering title of the land to the FmHA in satisfaction of its debt and which would potentially allow the FmHA to reap any profit over and above its debt, if such were desirable and achievable by the FmHA. Therefore, since the FmHA is given an enhanced mortgage position with collateral having a value sufficient to fully satisfy its debt, and since the plan envisions a disposition of this property under this favorable debt structure within a reasonable time after confirmation, the FmHA is receiving the "indubitable equivalent" of its lien claim under § 1129(b)(2)(B) and (C).[8]

Additionally, the Court notes that the FmHA's debt, as reconstructed into a clear second mortgage position, is also restructed in payments. The claim is reduced to a non-recourse ("in rem") basis, and is re-amortized over twenty years, with the first payment of principal and interest to come due one year after confirmation. New security agreements would issue to secure a note evidencing this restructured debt, which note would be at bear interest at the rate of ten percent (10%) per annum. The debtor would attempt to find a purchaser for this property under this restructured payment, and would reserve the right to abandon the collateral to this creditors or deed this Morehouse Parish Farm to the FmHA in lieu of foreclosure and in full satisfaction of its debt. This restructuring is consistent with other farmer reorganization cases. *See: In re Benson,* 9 B.R. 854, 7 Bankr.Ct.Dec. 713 (Bkrtcy.N.D.Ill.1981); *see, also,* all of the authorities cited at footnote 2, *supra.*

Finally, the alteration of the FmHA's rights envisions an exchange of its lien on the Ouachita Parish Farm in return for the cancellation of the ONB lien on the Morehouse Parish Farm. The debtor has estimated the Ouachita Parish Farm to have a value of approximately $967,000, which gives a value of approximately $1,210 per acre for the 800 acre tract.

The first mortgage debt on this farm is to John Hancock Life Insurance Co. (hereinafter "John Hancock"), which is owed approximately $521,000 or approximately $651 per acre. The second mortgage position of ONB is $310,000 and the third mortgage position of FmHA is approximately $1,140,-000. There is sufficient equity in the Ouachita Parish Farm, after deducting the amount owed on the first mortgage to John Hancock, to fully satisfy the second mortgage position of ONB; but there is insufficient equity after satisfying the first and second mortgages to provide any substantial and significant recovery for the third mortgage lien to the FmHA. Therefore, there is little potential value under reorganization concepts for this third mortgage position, and it must be found to be almost entirely unsecured under the valuation principals implicit in § 506(a) of the Code.[9]

Because of the above, and because the plan calls for cancellation of the ONB lien on the Morehouse Parish Farm, the plan envisions an eradication of this partially secured lien from the Ouachita Parish Farm. The eradication of this junior lien will insure that this property is not overly encumbered after confirmation, which should enhance the debtor's ability to continue farming operations on the Ouachita Parish Farm or find a favorable purchaser for the farm.

In passing, the Court would note that the debtor further proposes a marshalling of

---

7. Section 361(2) provides that "adequate protection" may be provided by a "replacement lien" being given to the debtor. 11 U.S.C. § 361(2) (1982). The exchange of liens under the plans achieves the equivalent of giving the FmHA a "replacement lien". *See* Anderson & Rainach, *supra* at footnote 2.

8. *See* all of the authorities cited at footnotes 2 and 3, *supra.*

9. *See, Darvilla Housing Corp. v. Accousti,* 2 Bankr.Ct.Dec. 1093 (D.Conn.1976); *In re 620 Church St. Bldg. Corp.,* 299 U.S. 24, 57 S.Ct. 88, 81 L.Ed. 16 (1936); Anderson & Rainach, *supra* footnote 2.

liens on the FmHA's other collateral involving crops and any farming proceeds. Through the releasing of these liens, the FmHA would get the clear second mortgage position on the Morehouse Farm. In return, ONB would receive crop proceeds, monies in the partnership checking account, payments from the Individual Debtors' retirement plan, payments from the sale of the real estate owned by the Individual Debtors personally in Pine Bluff, Arkansas, payments from the Individual Debtor's future earnings, and other sources of income. This restructuring of the payment of the ONB debt will also give the debtor a most probable chance of maintaining ownership of the assets which the Individual Debtors may best manage and make profitable, thereby providing financial rehabilitation for the Partnership Debtor and especially the Individual Debtors.

In essence, the FmHA receives an enhanced lien position on the Morehouse Parish Farm of $310,000, and is requested to forego a third mortgage lien on the Ouachita Parish Farm having a value of less than $136,000.[10] The FmHA must also forego disputed liens and undisputed liens on other collateral of approximately $80,000 to $90,000; and therefore, it appears that the FmHA is giving up liens on property having a value of approximately $236,000, more or less, and gaining a lien position in excess of $300,000. The benefit of the exchange/marshalling of liens appears to favor the FmHA.[11]

However, the exchange does not disfavor the ONB, since the debtor is dedicating properties and future earnings for the ONB recovery. Among other benefits, the ONB will receive liquid assets of the debtor gained through the lien exchange of approximately $80,000. The Individual Debtors will apply approximately $30,000 derived from their retirement plan built up from Mr. Iverson's prior law practice to the satisfaction of the ONB debt. Approximately $70,000 of the ONB debt secured by a first mortgage on the Individual Debtors' residence will balloon and be paid in approximately two years after confirmation. The residual lien existing on the Ouachita Parish Farm will be amortized and paid over five years after confirmation; and the lien on the property in Pine Bluff, Arkansas will also be amortized and "balloon" five years after confirmation. The repayment of the ONB debt is consistent with the income producing ability of the Individual Debtors and the Partnership Debtor, as well as their ability to sell property and use their other energies towards satisfaction of this claim.

In passing, the Court would note the following other provisions treating creditors. First, under the partnership plan, any unsecured claims of the partnership would be paid from liquidation of partnership property or proceeds derived from crops; and to the extent that these claims are not satisfied, the one-half of the virile liability will be satisfied by the Individual Debtors under their plan through payments from future earnings over five years. Presumably, the other partner, Mr. King, will bear his one half virile share of liability.

Secondly, under the individual's plan, Central Bank of Monroe, who holds a mortgage on an airplane, will have its debt restructured and paid over approximately seven years or will have its collateral abandoned to it.

Third, under the individual's plan, Monroe Building & Loan Association, who holds the first mortgage on a rent house owned by the Individual Debtors in Monroe, will be deemed unimpaired and paid its normal monthly installments from the future earnings of the Individual Debtors.

10. The "equity" (*i.e.,* value) for the FmHA's third mortgage lien on the Ouachita Farm is $136,000, which represents the difference between the fair market value of the farm and the amount owed to the first and second mortgage lien holders. Thus, the value of the FmHA lien erased on the Ouachita Farm is this equity. *See* the authorities cited at footnote 9, *supra.*

11. *See* the authorities cited at footnotes 6–8, *supra,* and the discussion contained in the accompanying text.

Fourth, under the individual's plan, the unsecured creditors of the debtors will be paid by the Individual Debtors the full principal amount of their debt in equal annual installments over five years from the debtors assets or future earnings.

Based upon all of the above, the Court finds as a matter of fact that the debtors' plans provide "adequate protection" for all lien claimants. The Court further finds that each lien claimant is receiving full satisfaction under the plans which constitutes the "indubitable equivalent" of any rights surrendered under the plans. Furthermore, the Court finds that the plans are "fair and equitable" to secured creditors by allowing them to retain their collateral (or, through an exchange of lien positions, equal or greater collateral) and receive payment for the full amount of their claims, together with a discount rate which is appropriate and which makes the deferred payments received under the plan the equivalent in value of present payment. Further, the Court finds that unsecured creditors are receiving "fair and equitable" treatment by full satisfaction of their claims. Finally, the Court finds that the plan is "feasible" in that it has a reasonable probability of success, a rational basis for satisfying all claimants, and an appropriate means for execution.

## CONCLUSIONS OF LAW

It is hereby determined by this Court that the plans in these reorganization cases are "fair and equitable" and "feasible". Therefore, they will both be confirmed.