### In re SAGEWOOD MANOR ASSOCIATES LIMITED PARTNERSHIP, Debtor.

### Bankruptcy No. BK–N 96–31923.

United States Bankruptcy Court, D. Nevada.

June 30, 1998.

Hartman & Armstrong, Ltd., Reno, NV, for Debtor.

Matthew Callister, Callister & Reynolds, Las Vegas, NV, for Creditor Beal Bank, S.S.B.

## ORDER

GREGG W. ZIVE, Bankruptcy Judge.

This matter came on regularly for hearing before Gregg W. Zive, U.S. Bankruptcy Judge, on confirmation of a plan of reorganization ("plan") proposed by debtor Sagewood Manor Associates Limited Partnership ("Sagewood") and objected to by creditor Beal Bank, S.S.B. ("Beal"). Appearing on behalf of Sagewood was Hartman & Armstrong, LTD. by Sallie B. Armstrong, Esq. and Edmond B. Miller, Esq.; appearing on behalf of Beal was Callister & Reynolds, by Matthew Q. Callister, Esq. and Michael J. Harker, Esq.

To confirm a plan of reorganization, the plan must be proposed in good faith, be feasible and fair and equitable pursuant to 11 U.S.C. §§ 1129(a)(3), (a)(11), (b)(1) and (b)(2)(A)[1]. Beal objected to the plan as not feasible, inequitable, and proposed in bad faith.

### WITNESSES

Four witnesses testified on behalf of Sagewood. Don Horton ("Horton"), vice president in charge of underwriting and asset management for Huntoon Hastings Capital Corporation, who testified as a loan underwriting expert; William Kimmel ("Kimmel"), MAI, SREA, who testified as an appraiser; Jeffrey Tabor ("Tabor"), asset manager for Insignia Financial Group; and Roy Lee, III ("Lee"), Sagewood's representative.

Sagewood also designated portions of the deposition of William Dickenson ("Dickenson"), Beal's representative, pursuant to Fed.

R.Civ.P. 30(b)(6) and read those portions into the record.

Two additional expert reports were introduced into evidence by stipulation. First, the report of Thomas Cargill ("Cargill"), a professor in the Department of Economics at University of Nevada, Reno, who rendered an opinion regarding the economic condition of Carson City as it affects Sagewood Manor. Secondly, the report of Professional Service Industries, Inc. ("PSI"), a nationwide professional engineering firm, which performed a physical assessment of Sagewood Manor.

Beal had three witnesses. They were Dickenson, Beal's representative; John Utter ("Utter"), a licensed mortgage broker who testified as an expert on the commercial mortgage market; and Frederick Woodside, of Gold Dust Commercial Associates, who testified as an expert on property management.

The court having heard, read and considered all of the evidence, exhibits, arguments, memoranda of law and being fully advised in the premises and good cause appearing therefore makes the following findings, conclusions and order.

### HISTORICAL FACTS

1. Sagewood is a Nevada limited partnership which was formed May 3, 1978.

2. Sagewood consists of approximately 34 limited partners and a Washington general partner, Security Properties '77A ("SP–77A").

3. Sagewood developed, constructed, owns and operates an apartment complex named Sagewood Manor ("Sagewood Manor") or the ("property") located in Carson City, Nevada.

4. Sagewood Manor is located near Highway 395, the main thoroughfare through Carson City, Nevada.

5. Sagewood Manor is located on approximately eleven acres and consists of 200 units of wood frame buildings, two stories each. The property has two

---

1. Unless otherwise indicated, all references to "chapter" or to "section" are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330. All references to "Rule" are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr.P"), Rules 1001–9036.

swimming pools, a tennis court, and a playground for children.

6. Sagewood Manor has 100 open parking spaces and 200 covered parking spaces.

7. Sagewood Manor adjoins Broadleaf Manor ("Broadleaf"), a multi-family housing project, that is substantially similar to Sagewood Manor. Affiliates of SP-'77A are general partners of Broadleaf.

8. Sagewood Manor and Broadleaf were both co-managed from the same office located at Sagewood Manor. First Security Properties Management, Inc. managed both projects until Insignia Financial Group ("Insignia") began managing the projects in July, 1993.

9. Broadleaf had not been maintained as well as Sagewood Manor until June 1997 when improvements were made to Broadleaf.

10. In May 1978, Sagewood executed a note secured by deed of trust to finance the purchase and construction of Sagewood Manor. It was insured by the U.S. Department of Housing and Urban Development ("HUD") pursuant to Section 221(d)(4) of the National Housing Act, as amended. The outstanding principal balance on the loan is approximately $5,528,828, the ("secured debt").

11. By 1992, the financial and physical condition of Sagewood Manor declined and Sagewood received an unsatisfactory rating from HUD.

12. In May 1992, Sagewood defaulted on its loan obligation to Reilly Mortgage Group Inc. ("Reilly"), the holder of the secured debt.

13. On November 20, 1992, Reilly assigned the secured debt to HUD.

14. Sagewood conducted negotiations with HUD before and after the May 1992 default but was unable to agree to a workout with HUD. Nevertheless, consistent with HUD's guidelines, starting in February 1994, Sagewood made payments of approximately 70% of the accruing interest. Sagewood paid $221,812 interest in 1994, $213,936 in 1995 and $241,889 in 1996.

15. In July 1993, Sagewood obtained the services of Insignia and Tabor to assist with the management and operation of Sagewood Manor. Tabor visited the property in September 1993 and discovered it needed significant repairs to the roofs, pools, sprinkler system, landscaping and siding, as well as the need to rehabilitate some of the units.

16. Insignia utilized operating revenues to make capital improvements to Sagewood Manor. From 1993 to 1996, Sagewood spent $1,005,064 for capital investments.

17. As a result of its improvements, Sagewood Manor received a satisfactory rating from HUD in 1994.

18. In October 1995, Beal purchased the note from HUD with approximately 90 other loans in a package. Beal also received an assignment of the deed of trust securing the note.

19. At the time Beal made its purchase, it was aware that Sagewood was delinquent $1,058,226.32 in interest and $229,220.23 in principal.

20. After purchasing the loan, Beal had Sagewood Manor appraised by Daniel Leck ("Leck") who appraised the property as having a value of $8,500,000 as of December 7, 1995.

21. Starting in January 1996, Sagewood tried to negotiate a workout with Beal. Sagewood continued to make monthly interest payments to Beal of $23,496.72 each through May, 1996, for a total of $187,973.

22. In May 1996, Beal commenced a nonjudicial foreclosure against Sagewood Manor and in late June 1996, obtained the appointment of Thomas W. Johnson ("Johnson") of Gold Dust Commercial Associates as temporary receiver for Sagewood Manor. Frederick Woodside ("Woodside"), a property manager for Gold Dust Commercial Associates, took control of the property on June 27, 1996. Woodside

oversaw the operation of Sagewood Manor until September 23, 1996.

23. Sagewood filed its chapter 11 petition on September 23, 1996, and resumed operating and managing Sagewood Manor.

24. Sagewood filed its disclosure statement on December 23, 1996.

25. Kimmel appraised the property as having a value of $8,200,000 as of April 7, 1997 and found that Sagewood Manor has a remaining economic life of 40 to 50 years.

26. Based upon the Leck and Kimmel appraisals, the court finds the fair market value of the property to be not less than $8,200,000.

27. As of May 1, 1997, the total amount due to Beal on the note was $6,925,835.31 consisting of $5,528,827.67 principal, $1,349,408.77 interest, $47,598.87 late charges and 21 cents escrow deficiency.

28. In 1997, Sagewood Manor had $1,328,525 in income and $777,629 in net operating income.

### APPLICATION OF SECTION 1129

 In order for a plan to be confirmed, the proponent must demonstrate that the requirements of § 1129 are satisfied. Sagewood "carries the burden of proving that a Chapter 11 plan complies with the statutory requirements of §§ 1129(a) & (b)" by a preponderance of the evidence. *In re Arnold and Baker Farms*, 177 B.R. 648, 654 (9th Cir. BAP 1994), *aff'd*, 85 F.3d 1415 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997). "Proof by the preponderance of the evidence means that it is sufficient to persuade the finder of fact that the proposition is more likely true than not." *Id.*, at 654.

"Section 1129 operates in two parts. First, § 1129(a) sets forth a number of requirements generally applicable to Chapter 11 plans." *In re 203 North LaSalle St. Ltd. Partnership*, 190 B.R. 567, 577 (Bankr.

N.D.Ill.1995), *stay denied*, 190 B.R. 595 (N.D.Ill.1995), *aff'd sub nom., Bank of America, Illinois v. 203 North LaSalle St. Partnership*, 195 B.R. 692 (N.D.Ill.1996). These requirements include § 1129(a)(8), which requires that the plan be accepted by each impaired class of claims or interests. Second, § 1129(b) provides that a plan which complies with all of the other requirements of § 1129(a) may be confirmed despite the failure of an impaired class to accept the plan, if several of the cramdown requirements, discussed infra, are met. *In re 203 North LaSalle St. Ltd. Partnership*, 190 B.R., at 577.[2]

#### A. Good Faith

 Section 1129(a)(3) requires that the plan be "proposed in good faith and not by any means forbidden by law." § 1129(a)(3). A legal distinction exists "between the good faith that is a prerequisite to filing a Chapter 11 petition and the good faith that is required to confirm a plan of reorganization." *In re Boulders on the River*, 164 B.R. 99, 103 (9th Cir. BAP 1994); *In re Stolrow's Inc.*, 84 B.R. 167, 171 (9th Cir. BAP 1988). Under § 1112(b), a Chapter 11 petition may be dismissed for cause "if it appears that the petition was filed in bad faith." *See In re Stolrow's Inc.*, 84 B.R., at 170. "Bad faith exists if there is no realistic possibility of reorganization and the debtor seeks merely to delay or frustrate efforts of secured creditors." *See In re Boulders on the River*, 164 B.R., at 103.

 "The good faith that is required to confirm a plan of reorganization requires the plan to achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Boulders on the River*, 164 B.R., at 103; *See In re Corey*, 892 F.2d 829, 835 (9th Cir.1989), *cert. denied*, 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990); *See In re Stolrow's Inc.*, 84 B.R., at 171; *See In re Jorgensen*, 66 B.R. 104, 109 (9th Cir. BAP 1986).

---

2. It is interesting to note Beal was involved in a chapter 11 case in the Northern District of Texas in which Beal raised factual and legal objections to plan confirmation similar in many respects to those raised by Beal in this case. The plan was confirmed and the confirmation was affirmed on appeal. *In re Way Apartments, D.T.*, 201 B.R. 444 (N.D.Tex.1996).

The objectives and purposes of the Bankruptcy Code have been addressed by the United States Supreme Court. The purpose of permitting business debtors to reorganize and restructure their debts through Chapter 11 is "to revive the debtors' businesses and thereby preserve jobs and protect investors." *Toibb v. Radloff*, 501 U.S. 157, 163, 111 S.Ct. 2197, 2201, 115 L.Ed.2d 145 (1991). "[T]he policy of Chapter 11 is to permit the successful rehabilitation of debtors. . . ." *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 527, 104 S.Ct. 1188, 1196, 79 L.Ed.2d 482 (1984). Furthermore, "[b]y permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203, 103 S.Ct. 2309, 2312–13, 76 L.Ed.2d 515 (1983). In *Toibb v. Radloff*, the court stated that Chapter 11 embodies the general policy of the Bankruptcy Code which is to maximize the value of the bankruptcy estate. *Toibb v. Radloff*, 501 U.S., at 163, 111 S.Ct., at 2201.

A bankruptcy judge assesses the good faith in proposing a plan of reorganization under the totality of the circumstances. *In re Boulders on the River, Inc.*, 164 B.R., at 104; *In re Stolrow's Inc.*, 84 B.R., at 172.

Sagewood has invested approximately one million dollars in an effort to increase its revenue, which it has succeeded in doing in the past five years under Insignia's management. Sagewood projects its net operating income and revenues will continue to increase if it is allowed to reorganize. Allowing Sagewood to reorganize will revive Sagewood's business, preserving jobs and protecting investors. A reorganization will satisfy the claims of secured and unsecured creditors and produce revenue for Sagewood's owners. Sagewood is not required to find a new lender or to sell property. Indeed, it is allowed to restructure its financial obligations, so long as it conforms to the requirements of the Bankruptcy Code.

Based upon the totality of the circumstances, the court finds that the plan will effectuate the purposes and policies of the Bankruptcy Code and is proposed in good faith.

### B. Feasibility

Section 1129(a)(11) requires the court to find that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." § 1129(a)(11); 7 Collier on Bankruptcy ¶ 1129.03[11], at 1129–64 (15th ed. Rev.1997).

The feasibility test set forth in § 1129(a)(11) requires the court to scrutinize the plan to determine whether it offers a reasonable prospect of success and is workable. 7 Collier on Bankruptcy ¶ 1129.03[11], at 1129–64; *See In re Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir.1985). The debtor must present "ample evidence to demonstrate that the [p]lan has a reasonable probability of success." *In re Acequia*, 787 F.2d 1352, 1364 (9th Cir.1986). "Success need not be guaranteed." *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 649 (2d Cir.1988). The mere potential for failure of the plan or the prospect of financial uncertainty is insufficient to disprove feasibility. *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 762 (Bankr.S.D.N.Y.1992).

While a reviewing court "must examine 'the totality of the circumstances' in order to determine whether the plan fulfills the requirements of § 1129(a)(11)", *S & P, Inc. v. Pfeifer*, 189 B.R. 173, 183 (N.D.Ind. 1995) *(quoting In re Mulberry Phosphates, Inc.*, 149 B.R. 702, 708 (Bankr.M.D.Fla. 1993)), only "a relatively low threshold of proof [is] necessary to satisfy the feasibility requirement." *In re Sea Garden Motel And Apartments*, 195 B.R. 294, 305 (D.N.J.1996). The key element of feasibility is whether there exists a reasonable probability that the provisions of the plan of reorganization can be performed. *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R., at 762. However, where the financial realities do not accord with the proponent's projections or where the projections are unreasonable, the plan should not be confirmed. *In re Lakeside*

*Global II, Ltd.,* 116 B.R. 499, 507 (Bankr. S.D.Tex.1989).

" 'The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.' " *Matter of Pizza of Hawaii, Inc.* 761 F.2d 1374, 1382 (9th Cir.1985) (*quoting* 5 Collier on Bankruptcy ¶ 1129.02[11], at 1129–34 (15th ed.1984)).

■■■■■ Feasibility is established through expert testimony "and those knowledgeable of the future prospects of the reorganized debtor. The inquiry is on the viability of the reorganized debtor, and its ability to meet its future obligations, both as provided for in the plan and as may be incurred in operations." 7 Collier on Bankruptcy ¶ 1129.03[11], at 1129–65. "In this respect, 'section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan.' " 7 Collier on Bankruptcy ¶ 1129.03[11], at 1129–65 (*quoting S & P, Inc. v. Pfeifer*, 189 B.R., at 183) (*citations omitted* ).

■■■■■ The "[t]raditional factors which have evolved to aid the bankruptcy court in a feasibility analysis include: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan." *In re Lakeside Global II, Ltd.,* 116 B.R., at 506. *See also In re Acequia,* 787 F.2d 1352, 1364 (9th Cir.1986) in which the debtor provided the court with both " 'conservative' and 'best case' projections." Additionally, the debtor's experts testified that the debtor's assets were attractive and in demand. *Id.* at 1364. This list of factors is neither exhaustive nor exclusive. *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R., at 763.

**I. *Adequacy of the Capital Structure***

a. Sagewood's 1997 Business Asset Plan (exhibit 342) shows plan projections from 1997 to 2003. Sagewood contends there will be a $72,975 increase in net revenues in 1997, which is approximately the same amount of the increase from 1996. Woodside agreed that Sagewood could achieve this in 1997, particularly with reduced expenses, including no bookkeeping charge and a lower management fee. Sagewood projects an increase of $32,292 in net operating income ("NOI") in 1997. This is the amount available before debt service and capital expenditures.

Sagewood also projects a 4% growth in rent. Given the improvements Sagewood has stipulated to make, Sagewood Manor can command higher rents. Additionally, Woodside agreed that a 4% growth in rent is reasonable and it has been borne by the market the last three to four years. A 4% growth in rent is reasonable over the long term. Cargill opined that the specific rental market for Sagewood Manor will be positively impacted by current and anticipated economic, demographic and transportation influences. Cargill reported the projected rent increase of 4% in 1997, 1998, and 1999 is within the range consistent with economic and demographic conditions and the supply of housing in Carson City and as well as the general trend in inflation rates.

The plan projections, which include a 4% growth in rent, are reasonable and accurate per Woodside and Cargill. The court finds that Sagewood's projections are reasonable and consistent with the economic conditions projected by Cargill.

Sagewood projects a vacancy loss of 5%. This represents a $19,756 decrease in the vacancy loss for 1997 as compared to the previous year. Woodside agreed that with competent management a 5 % vacancy loss is achievable. Given the immediate improvements to which Sagewood has stipulated and the economic conditions in Carson City to which Beal agrees, the court finds this is a reasonable projection.

While Beal contends that the vacancy loss should be 10%, Cargill testified the rental market for Sagewood Manor should be posi-

tive over the next thirty-five years and, combined with prudent management, Sagewood Manor will operate within generally accepted vacancy rates in the future. Considering the general economic and demographic environment for Sagewood Manor, vacancy factors at comparable apartments, and the special conditions affecting the property, Cargill opined that the relevant vacancy factor for business projects is less than 10 percent. The court agrees with Cargill's analysis and opinions.

Sagewood's projections of operating costs are also reasonable. Sagewood has estimated a $40,083 increase in expenses from 1996 to 1997 for a total of $590,979 or $2,955 per unit. This is close to Kimmel's opinion of operating costs of $3,000 per unit. There is a small increase of 0.6% projected in 1998, and thereafter, a 2.5% increase in operating costs every year.

Woodside projected an expense of $3,264 per unit for 1997, but this projection was not adjusted for HUD-related expenses and did not account for the non-recurring charges in 1994–95.

The projections in the 1997 Asset Business Plan show Sagewood's ability to meet capital expenditures and pay an additional $56,000 per year in replacement reserves to be used for immediate needs. There are also sufficient funds to pay unsecured creditors. The capital expenditures are estimated over twelve years and the replacement reserves will correct the remaining problems at Sagewood Manor. Tabor testified that even under the worst case scenario, where the NOI only kept up with inflation, there is sufficient income to make payments for debt service, to fund the replacement reserves, to pay unsecured creditors, and to also fund the capital expenditures.

Beal asserts that Broadleaf has the potential to harm the viability of Sagewood Manor. Woodside opined that because Sagewood Manor is now a conventionally financed property and Broadleaf is a HUD insured property, Broadleaf appeals to low-income renters. However, Lee testified that Broadleaf does not receive any subsidies for low-income renters or Section 8 contracts. Kimmel testified that Broadleaf would not have an im-

pact on the value of Sagewood Manor unless Broadleaf was "really trash," which would be reflected in a declining rental income at Sagewood Manor. Additionally, the Broadleaf limited partnership has recently made $200,000 in expenditures to improve the landscaping, the paving and the roofs. Broadleaf does not impair the ability of Sagewood Manor to meet Sagewood's projections.

The projections show an adequate capital structure and that there will be sufficient funds from operations to meet capital expenditures. The plan is not conjectural, speculative or unrealistic. The projections show a reasonable prospect of success and that no further reorganization or liquidation will be required.

## II. *Earning Power of Sagewood Manor*

There is evidence of prepetition and postpetition financial progress. The Income and Expense Summary of Sagewood Manor summarizes the historical revenues and expenses since 1992, including NOI (exhibit 303), while the Income and Expense Analysis (exhibit 304) analyzes each of the major categories of the income and expenses summarized in the Income and Expense Summary.

Tabor testified that the operating performance of Sagewood Manor has improved since 1992, the year of default. The exhibits reflect an increase in NOI from $241,012 in 1992 to $590,745 in 1995. The 1996 NOI is $777,629 and the 1997 budget projected an NOI of $809,921. The gross potential rent increased from $1,114,565 in 1992 to $1,316,300 in 1995. The gross potential rent in 1996 was $1,359,102 and was projected to be $1,422,000 in the 1997 budget.

The operating costs were $698,025 in 1992 and dropped to $665,296 in 1995. The 1996 operating costs were $550,896 and the operating costs projected in the 1997 budget were $590,979. The decrease in operating costs is an improvement even though the operating expenses increased by $159,691 for nonrecurring improvement costs in 1994 and 1995.

While Beal did not challenge the improved operating performance of Sagewood Manor, Woodside testified that expenses were excessive from 1993 to 1995. Relying on the

expense ratios [3] identified in Kimmel's report,[4] and his own experience Woodside opined that an appropriate expense ratio was in the 45% range which is an expense ratio for conventionally financed projects. While an accountant Woodside managed several projects in Kings Beach and Sacramento, California, but they consisted of 48 units or less. Woodside has not managed any multi-family housing since being employed by Gold Dust Commercial Associates, with the exception of the three month receivership of Sagewood Manor. Woodside is not a Certified Property Manager ("CPM"), which is a professional designation sponsored by the Institute of Real Estate Management ("IREM"). Sagewood's witnesses had far broader experience as well as superior training and, therefore, Woodside's testimony will be given less weight.

The higher operating expenses in 1994 and 1995 were partly due to the $115,829 expended in 1994 and the $43,862 expended in 1995 on painting and other decorating that were expensed rather than capitalized. Woodside made no adjustments for HUD-related expenses which were no longer relevant.

In any event, in 1996, the expense ratio was approximately 41%, which is an improvement over the 45% standard relied upon by Woodside. Woodside contends that the reduction was due to the cash flow being closely monitored by the court and the receiver. However, the expense ratio was between 38.4% and 44.5% when there was no court supervision.

There was no challenge to the accuracy or reliability of the gross potential rent or the net revenue for 1996. The expense ratio is affected not only by a decrease in expenses but also by an increase in revenues. Sagewood has proven the that the 1996 figures are accurate and reliable. Additionally, there was no challenge to Tabor's testimony that Sagewood is meeting its NOI projections.

The court finds that the financial history of Sagewood Manor demonstrates that its operating performance has substantially improved, with the net revenues increasing and expenses declining.

III. *Economic Conditions*

a. Required Repairs.

PSI produced a report dated April 17, 1997 of its assessment of the physical condition of Sagewood Manor. The report includes an analysis and recommendations for repairing the property, the timing of the repairs and the cost. Exhibit 306.

PSI provided an ongoing maintenance schedule so that Sagewood Manor could establish an appropriate capital replacement reserve. Immediate repairs needed at Sagewood Manor were identified. A Replacement Reserve Spread Sheet, showing the physical needs, including ongoing replacement and anticipated repair over a 12 year term, was included.

Beal and Sagewood stipulated to make immediate improvements under the plan to enhance the appearance of the property. The total cost of the repairs identified by PSI and stipulated to by the parties is $273,000. PSI's report and the parties agreement adequately provides reserves for Sagewood Manor's immediate repairs and for replacement over a 12 year term. There has not been any deterioration of the property during the pendency of this case and the condition of the collateral has been maintained.

b. Value of Sagewood Manor.

The appraised value of Sagewood Manor is not less than $8,200,000.

In his uncontroverted reported, Cargill opines that Carson City is most likely to experience slow but sustained economic growth over the next 35 years. Additionally, the general housing and rental market in Carson City is most likely to experience slow but sustained appreciation and increased demand for rental property with a positive demand for low- to- middle-income rental property. Cargill states that the specific rental market for Sagewood Manor will be positively impacted by current and anticipat-

---

**3.** The expense ratio is determined by dividing the operating expenses by the net revenue.

**4.** Sagewood Manor's historical expense ratios: 1993–55%; 1994–65%; 1995—53%.

ed economic, demographic and transportation influences. The court finds the economic conditions of the Carson City area as they are pertinent to Sagewood Manor are as set forth in Cargill's report.

IV. *Ability of Insignia to Manage Sagewood Manor and the Probability of Its Continuation*

Insignia will continue to manage Sagewood Manor. Insignia's management is competent and efficient and provides certain advantages, including employee benefits for on-site staff, training, national purchasing, detailed accounting reports, and continuity of management.

Dickenson admitted that he did not have any problem with Insignia's management of Sagewood Manor or the proposed management fee of 5%. Woodside found the on-site staff of Insignia to be motivated, hard working, and competent when he took control of the property on behalf of the receiver, and found no reason to make any changes. Lee, who has direct oversight of Sagewood Manor for Sagewood, testified that he would replace Insignia if it failed to meet the 5 % vacancy projection.

While Beal contends that Insignia should not share management of Sagewood Manor with Broadleaf, the court finds this shared management is not detrimental to Sagewood Manor. While there was no evidence that terminating shared management would result in any benefit to Sagewood Manor, there was evidence that shared management did result in a reduction of Sagewood Manor's operating expenses.

Insignia did not fail to properly manage the property by engaging in shared management. Insignia's management practices are largely responsible for the financial and physical improvements of both of Sagewood Manor and Broadleaf.

V. *Matters which Determine the Prospects of a Sufficiently Successful Operation to Enable the Performance of the Plan*

a. Sagewood Manor is attractive and in demand.

Sagewood Manor has desirable qualities. When Kimmel appraised Sagewood Manor in September, 1996, he found it to be overall in good condition, noting the repairs and improvements. From 1993 to 1997, Sagewood invested approximately one million dollars in repairs and improvements. Sagewood Manor is located in one of the better neighborhoods in Carson City, due, in part, to both residential and commercial development. The evidence indicates that there will be steady growth in Carson City. Kimmel projected a vacancy and credit loss of only 8% for Sagewood Manor.

Sagewood Manor is located on a main thoroughfare making it easily accessible to the Carson City community and commuters.

The construction of Sagewood Manor is good with attractive floor plans. The pool, tennis court, playground for children and the parking, both covered and uncovered, contribute to making the property attractive and should allow it to maintain demand.

b. Risk of Subsequent Default

In light of the foregoing factors and projections, the court finds that the risk of subsequent default is low. The problems that existed at the property have been addressed. The property has a high occupancy rate and exists in a good market. Sagewood Manor is generating sufficient NOI and there is enough cushion in the projections to accommodate unforseen setbacks.

As a result of its findings regarding the foregoing feasibility concerns, the court finds the plan to be workable with a reasonable probability of success. *In re Acequia, Inc.,* 787 F.2d, at 1364. Sagewood's prepetition financial progress since 1993, its financial progress during the pendency of this case and its projections of future earnings are probative of the feasibility of this plan. They establish that Sagewood is unlikely to face future bankruptcy proceedings. Additionally, the assets are attractive and in demand. *Id.,* at 1364. The forgoing factors establish that Sagewood has met its burden by a preponderance of the evidence that the plan of reorganization is feasible pursuant to 1129(a)(11).

### C. Fair and Equitable

#### I. Restructuring Secured Debt

██ Sagewood's plan provides for the restructuring of the debt to Beal. All interest, late charges, and other charges which Beal is owed are to be capitalized as part of the "new secured debt". The new secured debt will be amortized over a reasonable period of time and interest is to accrue on the new secured debt at a reasonable rate. Sagewood will begin making equal monthly payments on the initial payment date in accordance with the amortization schedule.

Sagewood contends that a loan in the commercial market is available for the property. Therefore, Sagewood argues it will be paying present value to Beal if its interest payments to Beal are equivalent to the interest payments it would be required to make on a loan which is available in the commercial market. Beal contends that the only loan which is available is a loan in the government multifamily commercial market, and thus, confirmation should be denied.

#### II. Cramdown Standard

Whenever a plan has not been consented to by all classes of creditors and equity interest holders, the debtor may seek confirmation of the plan by demonstrating that the plan is "fair and equitable" to the dissenting class. § 1129(b)(1).

Before the court may consider cramdown, all of the applicable requirements of § 1129(a), excluding § 1129(a)(8),[5] must be met. § 1129(b)(1). This court has determined that the plan is feasible, has been proposed in good faith and that all other applicable requirements of § 1129(a) have been satisfied.

Section 1129(b)(1) provides that the court, on request of the plan proponent, shall confirm the plan notwithstanding the objection of an impaired creditor "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." *In re Ambanc La Mesa Ltd. Partnership*, 115 F.3d 650, 653 (9th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998).

"To be 'fair and equitable' the plan must satisfy, with respect to secured claims, one of the following three tests:

(1) The creditor is to retain the lien securing its claim and is to receive deferred cash payments with a present value at least equal to the claim; or

(2) The property securing the claim is to be sold and the lien is to attach to the proceeds of the sale; the lien on the proceeds is then to be treated as described in test (1) or (3); or

(3) The creditor is to realize the indubitable equivalent of its secured claim." *In re Ambanc La Mesa Ltd. Partnership*, 115 F.3d 650 at 653; *In re Arnold & Baker Farms*, 85 F.3d, at 1420 (*citing* § 1129(b)(2)(A)).[6]

Sagewood wants to use the first alternative means of fair and equitable treatment. It is undisputed that Beal is to retain the lien which secures its claim. It is also undisputed that the value of Sagewood Manor exceeds

---

**5.** Section 1129(a)(8) provides: "With respect to each class of claims or interests-(A) such class has accepted the plan; or (B) such class is not impaired under the plan."

**6.** Section 1129(b)(2)(A) provides, in relevant part:
(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements: (A) With respect to a class of secured claims, the plan provides-
(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
(iii) for the realization by such holders of the indubitable equivalent of such claims. § 1129(b)(2)(A).

the amount of Beal's claim. Sagewood has agreed to make cash payments to Beal which total the allowed amount of Beal's secured claim. It is the requirement that the payments under the plan have a present value equal to the allowed amount of the claim which is in dispute.

### III. *Present Value Analysis.*

Confirmation of a plan "requires that a creditor or interest holder receive property 'of a value, as of the effective date of the plan' equal to some amount, usually the allowed amount of the participant's claim. Congress was clear that the use of this term meant that courts were to calculate the 'present value' of the property." 7 Collier on Bankruptcy ¶ 1129.06[1][b], at 1129–144. " 'This contemplates a present value analysis that will discount value to be received in the future.' H.R.Rep. No. 595, 1st Sess. 414 (1977), *reprinted in* App. Pt. 4(d)(I).... ('The property is to be valued as of the effective date of the plan, thus recognizing the time-value of money.')" 7 Collier on Bankruptcy ¶ 1129.06[1][b], at 1129–145 n. 3.

Present value is a term which reflects the time value of money. The "present value analysis calculates the value of property or cash to be received in the future." 7 Collier on Bankruptcy ¶ 1129.06[1][b], at 1129–145. This "analysis assumes that the payments will be made as promised. Compensation for the risk that the promised payments will be made is taken into account when selecting the components of the analysis, such as the interest rates to be used." 7 Collier on Bankruptcy ¶ 1129.06[1][b], at 1129–145.

A present value analysis has two steps. "First, the amounts to be paid must be calculated.... Second, the amounts promised to be paid in the future are reduced, or discounted, to current dollar values. This is done by selecting a rate at which an amount today could be invested to yield the promised amount when it is promised to be paid." 7 Collier on Bankruptcy ¶ 1129.06[1][b], at 1129–145.

The Ninth Circuit has adopted a case by case market approach for calculating present value payments under § 1129(b)(2)(A)(i)(II). *In re Camino Real Landscape Maintenance Contractors, Inc.,* 818 F.2d 1503, 1505 (9th Cir.1987).

The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default. *In re Camino Real Landscape Maintenance Contractors,* 818 F.2d, at 1505 (*quoting* 5 Collier on Bankruptcy ¶ 1129.03[4][f][i], at 1129–107(15th ed.1987)).

While the courts have determined that a market rate of interest is appropriate, there are two approaches used to calculate the market cramdown rate. The first approach "is for the court to determine the current market interest rate for similar loans in the region." *In re Fowler,* 903 F.2d 694, 697 (9th Cir.1990). "Under this approach, the court sets the cramdown rate by taking testimony on current market rates regarding loans for the length of time involved secured by the type of property involved." *In re Fowler,* 903 F.2d, at 697 (*citing* 5 Collier on Bankruptcy ¶ 1225.03[4][c], at 1225–24). "The second method for determining the appropriate market rate is the use of a formula. Under this approach, the court starts with a base rate, either the prime rate or the rate on treasury obligations, and adds a factor based on the risk of default and the nature of the security (the 'risk factor').... The formula approach requires the court to assess the risks associated with a given debtor and the security associated with a specific debt. Nevertheless, evidence of market interest rates for similar loans is relevant in arriving at the appropriate risk factor." *In re Fowler,* 903 F.2d, at 697–698 (*citing* 5 Collier on Bankruptcy ¶ 1225.03[4][c], at 1225–23) "(stating that the use of a formula should be only a presumption, and that courts 'should always allow the parties to introduce evidence of market rates to rebut the presumption')."

"The most widely-held definition of 'market rate' is the rate which regional lenders of similar loans ... would actually charge per-

sons similarly situated to the debtor on the open market, absent the fact of bankruptcy, considering the payout time, the amount and quality of the collateral, and other risk factors." *In re Shannon,* 100 B.R. 913, 936 (S.D.Ohio 1989).

## IV. *Blended Rate*

The Ninth Circuit has employed a blended rate analysis for determining the interest rate payable on the deferred payment of an obligation in a cramdown. In *In re Boulders on the River, Inc., supra,* the debtor sought to convert a thirty-month construction loan to a permanent loan by amortizing the balance over a twenty-five year period, with a balloon payment at the end of seven years. The debtor proposed a market interest rate interest, while the lender proposed to use a blended interest rate.

"[E]xpert testimony at the confirmation hearings revealed that financial institutions usually lend money at a 70% loan to value ratio. To the extent that a loan is less than or equal to 70% of the value of the property securing the loan, a market interest rate will prevail. However, to the extent that the loan exceeds 70% of the value, the lender is exposed to additional risk and should therefore be compensated by a corresponding increase in the interest rate." *In re Boulders on the River, Inc.,* 164 B.R., at 105.

The court utilized the formula approach and adopted a blended rate applicable to funds in excess of the 70% loan to value ratio, while applying the market rate of interest to funds up to 70% of the loan to value ratio. This approach was found to treat the lender's claim fairly and equitably.

## V. *Terms of the New Secured Debt.*

### a. Market Rate of Interest

The court has reviewed and studied the expert testimony regarding the loan market available to Sagewood. The court finds that Sagewood would qualify for several loans available in the market.

There is no dispute between Sagewood and Beal that the interest yield on ten-year treasuries is the appropriate base rate for a determination of the applicable market rate of interest for a loan on the type of property such as Sagewood Manor.

There are available FHA 223(f) loans that require an 85% loan to value ratio with a spread of 95 to 120 basis points over the ten-year treasury. The borrower must pay 0.5% of the principal as mortgage insurance premium. A 222(f) loan is amortized over 35 years and the debt service ratio cannot fall below 1.15.

A conduit loan is also available at a loan to value ratio of 80% with a 30-year amortization at an interest rate 180 to 150 basis points over the ten-year treasury.

Fannie Mae DUS loan is also available with a loan to value ratio of 80% with a 30-year amortization at an interest rate 120 to 160 basis points over the ten-year treasury.

Additionally, there would be conventional financing available with loan to value ratios of 75% with a 20 year amortization at an interest rate 200 to 225 basis points over the ten-year treasury.

It does not matter that Beal is not a government leader because the character of the creditor is not germane. *In re Camino Real Landscape Maintenance Contractors, Inc.,* 818 F.2d at 1506. Even if it were relevant, the court is convinced that the plan nevertheless treats Beal fairly, equitably and does not unfairly discriminate against Beal.

A blended rate will provide a factor in lieu of mortgage insurance and Sagewood cannot be required to sell the property.

The evidence indicates that an appropriate market rate of interest on $6,560,000 (80% of $8,200,000) is 8.1 percent which is just below the interest rates available in the conventional multi-family commercial market for this property amortized over 30 years. The interest rate on the balance of Beal's claim, $365,835.50, must be determined based upon several factors, including nature of the loan, the collateral and risk of default.

It has already been found that the property is attractive and in demand. Sagewood has a strong equity position which leads the court to conclude it has strong motivation to have this plan succeed and the plan has previously been found to be feasible. All of

the foregoing leads the court to find an adjustment of 90 basis points over the 8.1 percent rate available to Sagewood for that portion of the loan that falls within the 80% loan to value ratio. The blended rate then would be 8.15 percent.

The court finds and concludes that the loan to Beal can be restructured to provide Beal with a blended interest rate of 8.15 percent.

### b. Term of The Loan

Sagewood proposes that the full amount of the note, $6,925,835.31, which includes a principal balance of $5,528,827.67, accrued interest of $1,349,408.77, late charges of $47,-598.87 and an escrow deficiency of $0.21 be amortized over 30 years with the debt to become fully due and payable in 22 years. Sagewood argues that it is fair and equitable to extend the time period because the deferred cash payments are equal to the present value of Beal's claim. Beal objects to the extension of the time period under the note.

Section 1129(b)(2)(A) does not prohibit the extension of secured debt. In *In re Benson*, 9 B.R. 854 (Bankr.N.D.Ill.1981), the debtor proposed to extend a two-year loan to over twenty years. The court held that the "debtor's proposal to extend a two-year loan over twenty years must equitably and fairly provide the bank with adequate protection that is completely compensatory." *In re Benson*, 9 B.R., at 858. The court stated that the "adequate protection need not be geared to whether the arrangement is profitable for the creditor, merely whether it [the bank] is getting the value of its collateral." *In re Benson*, 9 B.R., at 858. The plan was confirmed because the value of the security greatly exceeded the Bank's claim, the value of the security was not depreciating and adequate protection existed if the bank was paid over the 20 year period at interest rates which would make the bank whole. *In re Benson*, 9 B.R., at 858.[7]

7. This case was decided under the former Bankruptcy Act § 461(11) which provided for a plan to be "crammed-down" over the objection of the sole secured creditor provided that the creditor is adequately protected. The court opined that the repeal of the fair and equitable test from Chapter

In *In re Mulberry Agric. Enters., Inc.*, 113 B.R. 30 (D.Kan.1990), the court approved a thirty year repayment finding it to be fair and equitable. The court held that the economic prerequisites of § 1129(b)(2)(A)(i) through (iii) were met "because the plan provided for retention of liens and payment to the ... [creditors], including deferred cash payments totaling the allowed amount of their claims having a value, as of the effective date of the plan, of the value of their interest in the property." *In re Mulberry Agric. Enter., Inc.*, 113 B.R., at 32. The creditors objected that the plan was not fair and equitable because the payment of their claims would not be received in a reasonable amount of time. In holding that the plan was fair and equitable, the court considered "the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances" of the case. *In re Mulberry Agric. Enter., Inc.*, 113 B.R., at 32 (*citing In re D & F Construction Inc.*, 865 F.2d 673, 675 (5th Cir.1989)). The *Mulberry Agric.* court also reviewed other cases which have confirmed plans over the objection of creditors if the requirements of § 1129 are satisfied. These cases did not take a creditor's reluctance in making long-term loans into consideration when making a decision as to whether the plan was fair and equitable:

> The Court believes that § 1129 does not per se prohibit long term payouts. If the mathematical requirements of § 1129(b)(2)(A)(i)(II) are satisfied, if the creditor is adequately protected under the plan, pursuant to the general fair and equitable requirement of § 1129(b)(2), and if the debtors can prove they can make payments over the life of the plan pursuant to § 1129(a)(11), then the plan is confirmable and can be crammed down on a rejecting class of secured claim holders, regardless of normal lending practices or policies. *In re Mulberry Agric. Enter., Inc.*, 113 B.R., at 33 (*quoting In re White*, 36 B.R. 199, 203 (Bankr.D.Kan.1983)).

XII in 1952, abolished the judicially created absolute priority rule indicating a Congressional intent to make adequate protection, rather than creditor consent, the sole criterion which is essential to confirm a § 461(11) cramdown. *In re Benson*, 9 B.R., at 857.

The *Mulberry Agric.* court concluded that "[t]he law appears to support the stretch out of lending terms, despite the original intentions of the lenders, given the satisfaction of other prerequisites which have not been challenged here." *In re Mulberry Agric. Enter., Inc.*, 113 B.R., at 33.

In *In re Martin*, 66 B.R. 921 (Bankr. D.Mont.1986), the court confirmed a plan which restructured a note and mortgage from 7 to 20 years, over the dissent of the secured creditors. The court concluded that the Code allows mortgage debts to be extended.

'As one commentary has noted, bankruptcy courts may 'cram down' feasible plans of reorganization under the reorganization provisions (e.g. section 1129) of the new Bankruptcy Code, where such plans seek to achieve restructuring of mortgage debts secured by real estate as follows:

(1) The term of any mortgage debt may be extended;

(2) Payments required by the mortgage debt of either principal or interest may be postponed; and

(3) Deferred or reduced payments of principal or interest may be added to the mortgage balance.' *In re Martin*, 66 B.R., at 930 (*quoting In re Hollanger*, 15 B.R. 35, 47 (Bankr.W.D.La.1981)).

The *Martin* court found the restructuring to be reasonable considering the creditor "will retain its lien on the real property as a first mortgage holder and, since long term mortgages on real property are normal, the terms of 20 years is not unreasonable, particularly when the [p]lan provides for full payment of its debt on a present value basis." *In re Martin*, 66 B.R., at 930.

Beal's treatment under the plan is fair and equitable, and consistent with the evidence, if the loan due Beal is amortized over twenty-five years.

The original due date of the note was June 1, 2020. When Beal purchased the note there were 24 years remaining but, of course, the note was in default. The new secured debt under the plan will become fully due and payable in 17 years, which is nearly double the term available in the conventional multi-family market and half the 35-year term available in the government multi-family commercial market.

In sum, as a court of equity, the court finds the new secured debt under the proposed plan shall include all defaulted interest, late charges and other related charges to be included with the principal balance due under the defaulted loan and the sum of these amounts shall constitute the principal amount of the new secured debt. The new secured debt shall bear interest at the blended rate of 8.15 percent, amortized over 25 years and all due and payable in 17 years. These deferred cash payments are equal to the present value of Beal's claim. Section 1129(b)(2)(A)(i).

### D. Indubitable Equivalent

A plan may be confirmed over the objection of a secured creditor if the plan provides "for the realization by such holders of the indubitable equivalent of such claims." § 1129(b)(2)(A)(iii).

The concept of "indubitable equivalence" is rooted in Judge Learned Hand's opinion *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir.1935).

In Murel the court stated that 'a creditor who fears the safety of his principal will scarcely be content with ... [interest payments alone]; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that ... unless by a substitute of the most indubitable equivalence.' The key word is 'substitute.' *Matter of Sandy Ridge Development Corp.*, 881 F.2d 1346, 1350 (5th Cir.1989), *reh'g denied*, 889 F.2d 663 (1989) (*quoting In re Murel Holding Corp.*, 75 F.2d, at 942) (*citations omitted*).

Where there is non-consensual confirmation, a payment stream with a present value of less than the allowed amount of the claim does not satisfy the indubitable equivalent standard. 7 Collier on Bankruptcy ¶ 1129.05[2][c], at 1129–136 (*citing* 124 Cong. Rec. 32407 (1978)). " '[P]resent cash payments less than the secured claim would not satisfy the standard because the creditor is deprived of an opportunity to gain from a

future increase in value of the collateral. ... Thus, if a plan proposes a below market interest rate for a deferred stream of payments equal to the allowed amount of the claim, not only will the treatment fail clause (i), but will fail clause (iii) as well.'" 7 Collier on Bankruptcy ¶ 1129.05[2][c], at 1129–136 & n. 39 (*quoting* 124 Cong. Rec. 32407 (1978)).

As one court stated:

Regardless of the consent of the secured claimant, the dissenting secured claimant will be receiving the 'indubitable equivalent' of the rights it enjoyed upon filing of the reorganization through the plans' provisions. Stated another way, where a dissenting claimant is receiving payment in full over a reasonable period of time, with an appropriate interest or discount factor being paid, that creditor is receiving all the law requires, that is-full payment over a reasonable period of time. Such a dissenting secured claimant is not being deprived of any rights and is receiving completely compensatory treatment. Therefore, payment over a reasonable period of time with an appropriate interest or discount factor is generally the equivalent of payment now; or at least, it is a satisfactory substitute (provided by reorganization law) for any rights surrendered by the secured claimant pursuant to the 'cram down' provided in the plan. *In re Hollanger*, 15 B.R. 35, 46–47 (Bankr.W.D.La.1981).

"[T]he question of whether the interest received by a secured creditor under a plan of reorganization is the indubitable equivalent of his lien is one of fact. . . . Since . . . [the lender] is in the business of making loans, it can hardly complain that its loan was extended, provided not only that the security is adequate . . . but also that the interest rate compensates it for the opportunity cost of its money and the risk of default." *Matter of James Wilson Assocs.*, 965 F.2d 160, 172 (7th Cir.1992).

A creditor was held to have received the indubitable equivalent of his claim where the value of the property was $600,000 greater than the creditors' claim. *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1461 (10th Cir. 1985).

The deferred cash payments to be made to Beal provide Beal with the indubitable equivalent of its claim. Beal's security is adequate, and thus, the safety of its principal is insured. The value of Sagewood Manor exceeds the amount of Beal's claim. Sagewood has agreed to make cash payments to Beal which total the allowed amount of Beal's secured claim. Finally, the interest rate is greater than the note it purchased, which compensates Beal for the risk of default. Beal is not being deprived of any rights and is receiving completely compensatory treatment. It is receiving the indubitable equivalent of its claim. *In re Pine Mountain, Ltd.*, 80 B.R. 171 (9th Cir. BAP 1987).

### E. Absolute Priority Rule

 The fair and equitable test set forth in § 1129(b)(1), which includes the requirements set forth in § 1129(b)(2), incorporates the absolute priority rule. The absolute priority rule is codified in § 1129(b)(2)(B). *In re Bonner Mall Partnership*, 2 F.3d 899, 906 (9th Cir.1993), *cert. granted*, 510 U.S. 1039, 114 S.Ct. 681, 126 L.Ed.2d 648 (1994), *mot. to vacate denied and cert. dismissed*, 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994).

Section 1129(b)(2)(B) provides in part:

"With respect to a class of unsecured claims-(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim. . . ."

The absolute priority rule bars any junior classes from participating in a reorganization so long as any senior class dissents and is not paid in full. 7 Collier on Bankruptcy ¶ 1129.04[4][a], at 1129–83 (*citing Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988)).

In summary "'[a] plan of reorganization may not allocate any property whatsoever to any junior class on account of the members' interest or claim in a debtor unless all senior classes consent, or unless such senior classes receive property equal in value to the full amount of their allowed claims, or the debtor's reorganization value, whatever is less.'"

7 Collier on Bankruptcy ¶ 1129.04[4][a], at 1129–84 (*citation omitted*).

Beal asserts that Sagewood's plan is not fair and equitable because it violates the absolute priority rule. Sagewood argues that the absolute priority rule applies only to unsecured creditors, not to Beal because Beal is a secured creditor.

The statutory provisions incorporating the absolute priority rule explicitly mention unsecured claims and equity interests, not secured claims. "[W]here a statute is clear on its face, it is unnecessary to look to its legislative history to discern its meaning and scope." *In re Hudson*, 859 F.2d 1418, 1421 (9th Cir.1988). Although this court must accept statutory language which is clear on its face, this court reviewed the legislative history for guidance. The legislative history states:

> The general principle of the subsection permits confirmation notwithstanding nonacceptance by an impaired class if that class and all below it in priority are treated according to the absolute priority rule. The dissenting class must be paid in full before any junior class may share under the plan.... **Treatment of classes of secured creditors is slightly different** because they do not fall in the priority ladder, but the principle is the same. Specifically, the court may confirm a plan over the objection of a class of secured claims if the members of that class are unimpaired or if they are to receive under the plan property of a value equal to the allowed amount of their secured claims, as determined under proposed 11 U.S.C. § 506(a). The property is to be valued as of the effective date of the plan, thus recognizing the time-value of money. H.R.REP. NO. 595, 95th Cong., 1st Sess. 413 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6369.

The legislative history makes it clear that Congress intended the absolute priority rule to apply only to unsecured creditors, while secured creditors are to receive the present value of their claims under the plan of reorganization.

The United States Supreme Court and the Ninth Circuit, in explaining the absolute priority rule, have indicated that the absolute priority rule applies only to unsecured creditors. *See Norwest Bank Worthington v. Ahlers*, 485 U.S., at 202, 108 S.Ct., at 966. ("[T]he absolute priority rule 'provides that a dissenting class of **unsecured creditors** must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.'") (*Citation omitted*) (*Emphasis added*); *See also In re Perez*, 30 F.3d 1209, 1212–13 & n. 2 (9th Cir.1994). (In discussing the implication of the absolute priority rule as it relates to the "fair and equitable" requirement the court stated: "[t]he precise statutory definition of fair and equitable, as applied to a class of **unsecured creditors**, is as follows[.]") (*Emphasis added*); *See also In re Johnston*, 21 F.3d 323, 329 (9th Cir.1994) ("The absolute priority rule comes into play in the 'cramdown' situation ... that is, where the court confirms a reorganization plan over the objections of a class or classes of **unsecured creditors**—or, in bankruptcy parlance, where the plan is crammed down the throats of the objecting class[es]because the plan 'does not discriminate unfairly, and is fair and equitable' to each dissenting class.") (*citing* § 1129(b)(1)) (*emphasis added*).

The Ninth Circuit in *In re Ambanc La Mesa Ltd. Partnership, supra*, carefully limits an undersecured creditor's ability to raise the absolute priority rule to its unsecured claims only. *In re Ambanc La Mesa Limited Partnership*, 115 F.3d., at 654.

■ "The absolute priority rule requires that the holder of an **unsecured claim** must receive the full amount of its allowed claim unless all junior claims and interests will receive no property and retain no interest under the plan." *In re Patrician St. Joseph Partners Ltd. Partnership*, 169 B.R. 669, 682 (D.Ariz.1994) (*citing* 1129 § (b)(2)(B)) (*emphasis added*). The creditor in *In re Patrician St. Joseph Partners Ltd. Partnership*, unsuccessfully attempted to raise the absolute priority rule argument in *In re Paradise Springs Assocs.*, 165 B.R. 913 (Bankr.D.Ariz. 1993). *In re Paradise Springs* held that since the creditor made a § 1111(b) election, converting its unsecured claim to a fully se-

cured claim, it lacked standing to raise the absolute priority rule. *In re Paradise Springs Assocs.*, 165 B.R., at 920–21.[8]

The absolute priority rule applies to unsecured creditors and thus, cannot be raised by Beal, a fully secured creditor.

## CONCLUSIONS OF LAW

The court, having entered its findings of fact and having exercised its independent obligation to review and determine whether Sagewood's plan complies with each of the provisions of 11 U.S.C. § 1129, enters its conclusions of law as follows:

1. Confirmation of the plan is a core matter under 28 U.S.C. § 157(b) over which this court has jurisdiction to enter a final order. This court has jurisdiction over Sagewood's chapter 11 case pursuant to 28 U.S.C. § 1334 and 157(a) and LR 1001(b)(2) of the Local Rules of Practice of the United States District Court, District of Nevada.

2. After notice and a hearing on the adequacy of the debtor's disclosure statement, this court, pursuant to 11 U.S.C. § 1125 and FED.R.BANKR.P. 3016 and 3017, issued its order approving debtor's first amended disclosure statement and fixing time for filing acceptances or rejections of plan.

3. On or about April 4, 1997, Sagewood mailed to all creditors and equity interest holders the debtor's first amended disclosure statement, as approved, together with the plan and the ballots for accepting or rejecting the plan.

4. Notice of hearing on confirmation of the plan was proper, with such notice having been provided in accordance with FED. R. BANKR. P.2002(b), as evidenced by Sagewood's affidavit of mailing filed with the clerk of the court on April 9, 1997.

5. Sagewood's plan meets all of the following requirements:

(a) The plan complies with the applicable provisions of Title 11 of the United States Code as required 11 U.S.C. § 1129(a)(1).

(b) Sagewood complies with the applicable provisions of Title 11 of the United States Code as required by 11 U.S.C. § 1129(a)(2).

(c) The plan has been proposed in good faith and not by any means forbidden by law as required by 11 U.S.C. § 1129(a)(3).

(d) All payments made or to be made by Sagewood for services or for costs and expenses in or in connection with the case, or in connection with a plan and incident to the case, have been approved by, or are subject to the approval of, the court as reasonable as required by 11 U.S.C. § 1129(a)(4).

(e) Sagewood has disclosed the identity and affiliations of the persons proposed to serve, to be employed by or retained by Sagewood after confirmation of the plan as required by 11 U.S.C. § 1129(a)(5)(A).

(f) As required by 11 U.S.C. § 1129(a)(6), each holder of a claim or interest has accepted the plan or will receive under the plan property of a value, as of the effective date thereof, that is not less than the amount that such holder would receive or retain if Sagewood were liquidated under chapter 7 of 11 U.S.C. on such date.

(g) Classes 2, 3, 4 and 5 have accepted the plan as required by 11 U.S.C. § 1129(a)(8). Class 1 did not accept the plan; however, Sagewood has requested that the court confirm the plan in accordance with 11 U.S.C. § 1129(b)(1).

(h) The holders of claims of the kind described in 11 U.S.C. § 1129(a)(9)(A) will receive cash equal to the allowed amount of such claim in accordance with 11 U.S.C. § 1129(a)(9)(A). There are no holders of claims of the kind specified in 11 U.S.C. § 1129(a)(9)(B).

(i) Classes 2 and 3 have voted to accept the plan. Both classes are impaired. Acceptances in each class have been determined without including any acceptance of an insider and without including the acceptance of Insignia. The plan complies with 11 U.S.C. § 1129(a)(10).

(j) Confirmation of the plan is not likely to be followed by further financial reorgani-

---

**8.** *In re Paradise Springs Assoc.* held that the unsecured creditor lacked standing to raise argu-

ments relative to the new value exception to the absolute priority rule.

zation of Sagewood as specified in 11 U.S.C. § 1129(a)(11).

(k) All fees payable under 28 U.S.C. § 1930 will be paid on the effective date of the plan as required by 11 U.S.C. § 1129(a)(12).

(*l*) The plan is fair and equitable to the interest of Beal as required by 11 U.S.C. § 1129(b)(2)(A).

(m) The plan provides Beal with the indubitable equivalent of its claim, as required by 11 U.S.C. § 1129(b)(2)(A)(iii).

**IT IS HEREBY ORDERED:**

1. That all the applicable requirements of § 1129(a) have been satisfied;

2. That the plan is fair, equitable and does not unfairly discriminate against Beal pursuant to § 1129(b)(1) and § 1129(b)(2)(A);

3. That the plan of reorganization is confirmed, and shall bind Sagewood and Beal to the following terms: the new secured debt shall be amortized over 25 years, become fully due and payable in 17 years at an interest rate of 8.15 percent;

4. The plan shall bind Sagewood and all of its creditors and equity security holders. Sagewood shall be and is hereby authorized to prepare and execute all documents necessary to reflect the terms of the new secured debt.